UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JOHN DOE, JANE DOE 1, and JANE DOE 2, individually and on behalf of all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> NOURISH, INC., <br><br> Defendant. | Civil Action No. _____ <br><br> **COMPLAINT – CLASS ACTION** <br><br> **JURY TRIAL DEMANDED** |

## CLASS ACTION COMPLAINT

Plaintiffs John Doe, Jane Doe 1, and Jane Doe 2[1] bring this class action against Defendant Nourish, Inc. ("Nourish"), individually and on behalf of all others similarly situated, and allege, upon personal knowledge as to each of their own actions, counsel's investigation, and upon information and belief as to all other matters, as follows:

## I.    NATURE OF THE ACTION

1.    Nourish is a telehealth and telenutrition platform entrusted by consumers to match them with a dietician for nutrition counseling through https://www.usenourish.com/ ("Nourish's Website" or the "Website").[2]

2.    Plaintiffs bring this case to address Nourish's outrageous, illegal, and widespread violation of that trust by intercepting and disclosing the confidential personally identifiable

---

[1] To avoid further injury and damages to Plaintiffs relating to the disclosure of their confidential and highly sensitive PII and PHI by Nourish, Plaintiffs will move the Court for permission to proceed anonymously.

[2] https://www.usenourish.com/about (last visited February 10, 2026).

1

information ("PII") and protected health information ("PHI") (collectively referred to as "Private Information") of Nourish customers to third parties, including but not limited to: Meta Platforms, Inc. ("Meta") and Alphabet Inc. ("Google").

3.      Information about a person's physical and mental health is among the most confidential and sensitive information in our society, and the mishandling of medical information can have serious consequences, including discrimination in the workplace or denial of insurance coverage. If people do not trust that their medical information will be kept private, they may be less likely to seek medical treatment, which can lead to more serious health problems down the road. In addition, protecting medical information and making sure it is kept confidential and not disclosed to anyone other than the person's medical provider is necessary to maintain public trust in the healthcare system as a whole.

4.      Recognizing these facts, and in order to implement requirements of the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), the United States Department of Health and Human Services ("HHS") has established "Standards for Privacy of Individually Identifiable Health Information" (also known as the "Privacy Rule") governing how health care providers must safeguard and protect Private Information. Under the HIPAA Privacy Rule, no health care provider can disclose a person's personally identifiable protected health information to a third party without express written authorization.

5.      Plaintiffs and other Class Members who used Nourish's Website thought they were communicating only with their trusted healthcare provider. Unbeknownst to Plaintiffs and Class Members, however, Nourish had embedded its patient-facing Website with third-party tracking technologies including but not limited to the Google Analytics, Google DoubleClick, and the Meta

Pixel (collectively, "Pixels"), surreptitiously forcing Plaintiffs and Class Members to transmit to Google and Meta clicks, keystrokes, and intimate details about their medical treatment.

6.      Pixel installation is a website design and marketing revenue choice. Operating as designed and as implemented by Nourish, the Pixels allow the Private Information that Plaintiffs and Class Members submit to Nourish to be unlawfully disclosed to Google and Meta alongside the individual's unique User ID.

7.      By installing the Pixels on its Website, Nourish effectively planted a bug on Plaintiffs' and Class Members' web browsers and compelled them to disclose their communications with Nourish to Google and Meta.

8.      The Office for Civil Rights (OCR) at HHS issued a Bulletin to highlight the obligations of HIPAA-covered entities and business associates ("regulated entities") under the HIPAA Privacy, Security, and Breach Notification Rules ("HIPAA Rules") when using online tracking technologies.[3] The Bulletin expressly provides that "[r]egulated entities are not permitted to use tracking technologies in a manner that would result in impermissible disclosures of PHI to tracking technology vendors or any other violations of the HIPAA Rules." In other words, HHS expressly stated that entities like Nourish that implement Pixels violate HIPAA Rules.

9.      Nourish utilized the Pixels for marketing purposes in an effort to bolster its profits. For example, the Pixels are routinely used to target specific customers by utilizing data to build profiles for the purposes of retargeting and future marketing. Google and Meta also use Plaintiffs' and Class Members' Private Information to create targeted advertisements based on the medical conditions and other information disclosed to Nourish.

---

[3]      *See*      https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html (last visited February 13, 2026).

10.    The information that the Pixels transmitted to Google and Meta included the Private Information that Plaintiffs and Class Members submitted to Nourish's Website, including, for example, pages viewed, button clicks, forms submitted, appointment time, insurance provider, state selected for the service, and provider selected once the sign-up process was completed. This data was accompanied by information such as IP Addresses, cookies, and device identifiers that allow Google and Meta to identify and associate Plaintiffs and Class Members with each transmission of the Pixels.

11.    Such information allows a third party (e.g., Google and Meta) to know that a specific patient was seeking confidential medical care. Google and Meta, in turn, sell Plaintiffs' and Class Members' Private Information to third-party marketers who geotarget Plaintiffs' and Class Members' Google and Meta accounts based on communications obtained via the Pixels. Google and Meta and any third-party purchasers of Plaintiffs' and Class Members' Private Information also could reasonably infer from the data that a specific patient was seeking medical guidance for specific health goals from a licensed practitioner.

12.    Nourish receives and stores a variety of personal health information on its website. Healthcare patients simply do not anticipate that their trusted healthcare provider will send any personal health information or confidential medical information collected via its webpages to a hidden third party—let alone Google and Meta—without the patients' consent. Neither Plaintiffs nor any other Class Member signed a written authorization permitting Nourish to send their Private Information to Google and Meta.

13. Google prohibits the use of Google Analytics on "[u]nauthenticated pages that are related to the provision of health care services."[4] Meta has the same prohibition on transmission of Private Information.[5]

14. Despite these explicit prohibitions against this exact use case, Nourish willfully and intentionally incorporated the Pixels into its Website and servers. Nourish never disclosed to Plaintiffs or Class Members that it willfully abuses its third-party software tools to surreptitiously monitor, record, and share their sensitive and confidential communications and Private Information with third parties without consent.

15. Plaintiffs and Class Members were unaware that their Private Information was being surreptitiously transmitted to Google and Meta against their will as they communicated with their healthcare provider via the Website, or stored on Nourish's servers to be later transmitted to Google and Meta so it could be used for targeted advertising and marketing purposes.

16. Nourish breached its statutory and common law obligations to Plaintiffs and Class Members by, *inter alia*,: (i) failing to adequately review its marketing programs and web-based technology to ensure the clinic's Website was safe and secure; (ii) failing to remove or disengage technology that was known and designed to share web-users' information; (iii) failing to obtain the written consent of Plaintiffs and Class Members to disclose their Private Information to Google and Meta; (iv) failing to take steps to block the transmission of Plaintiffs' and Class Members' Private Information through the Pixels; (v) failing to warn Plaintiffs and Class Members; and (vi)

---

[4] HIPAA and Google Analytics, https://support.google.com/analytics/answer/13297105?hl=en (last accessed December 9, 2025).

[5] https://www.facebook.com/business/help/361948878201809?id=188852726110565 (last visited January 2, 2025).

otherwise failing to design, and monitor its Website to maintain the confidentiality and integrity of Plaintiffs' and Class Member's Private Information.

17.    As a result of Nourish's conduct, Plaintiffs and Class Members have suffered numerous injuries, including: (i) invasion of privacy; (ii) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Pixel, (iii) loss of benefit of the bargain, (iv) diminution of value of the Private Information, (v) statutory damages, and (v) the continued and ongoing risk to their Private Information.

18.    Plaintiffs seeks to remedy these harms and brings causes of action for (1) violations of the Electronics Communication Privacy Act ("ECPA") 18 U.S.C. § 2511, unauthorized interception, use, and disclosure; (2) negligence and negligence per se; (3) breach of fiduciary duty; (4) breach of confidence; (5) breach of implied contract; (6) unjust enrichment; (7) invasion of privacy, (8) violations of the Pennsylvania Wiretapping and Electronic Surveillance Control Act, 18 Pa. Cons. Stat. § 5725, (9) New York General Business Law § 349(h) ("Deceptive acts and practices unlawful"), and (10) Florida Security Communications Act (Fla. Stat. § 934.03).

## II.    PARTIES

Plaintiff John Doe

19.    Plaintiff John Doe is a natural person and, now and at all other times relevant to this action, is citizen of New York State where he intends to remain.

20.    Plaintiff accessed Nourish's Website on numerous occasions on his mobile device and/or computer to find and obtain medical treatment. At all relevant times, Plaintiff also had active accounts with Google and Meta.

21.    During Plaintiff's interactions on Nourish's Website, as described further herein, Nourish transferred to Google and Meta the Private Information of Plaintiff, including, for

example, the name of Plaintiff's dietician, Plaintiff's insurance provider, the appointment time of Plaintiff's dietician appointment after sign up, and Plaintiff's page views on the Website.

22.     Along with these transmissions, as described further herein, Nourish also disclosed to Google and Meta information sufficient to allow them to identify Plaintiff as the person receiving medical care and scheduling appointments, including user IDs, cookies, device identifiers, and IP addresses.

23.     Nourish transferred this Private Information without Plaintiff's knowledge, consent, or express written authorization. By failing to receive the requisite consent, Nourish breached confidentiality and unlawfully disclosed Plaintiff's Private Information.

Plaintiff Jane Doe 1

24.     Plaintiff Jane Doe 1 is a natural person and, now and at all other times relevant to this action, is citizen of Pennsylvania where she intends to remain.

25.     Plaintiff accessed Nourish's Website on numerous occasions on his mobile device and/or computer to find and obtain medical treatment. At all relevant times, Plaintiff also had active accounts with Google and Meta.

26.     During Plaintiff's interactions on Nourish's Website, as described further herein, Nourish transferred to Google and Meta the Private Information of Plaintiff, including, for example, the name of Plaintiff's dietician, Plaintiff's information provider, the appointment time of Plaintiff's dietician appointment after sign up, and Plaintiff's page views on the Website.

27.     Along with these transmissions, as described further herein, Nourish also disclosed to Google and Meta information sufficient to allow them to identify Plaintiff as the person receiving medical care and scheduling appointments, including user IDs, cookies, device identifiers, and IP addresses.

28.    Nourish transferred this Private Information without Plaintiff's knowledge, consent, or express written authorization. By failing to receive the requisite consent, Nourish breached confidentiality and unlawfully disclosed Plaintiff's Private Information.

Plaintiff Jane Doe 2

29.    Plaintiff Jane Doe 2 is a natural person and, now and at all other times relevant to this action, is citizen of Florida where she intends to remain.

30.    Plaintiff accessed Nourish's Website on numerous occasions on his mobile device and/or computer to find and obtain medical treatment. At all relevant times, Plaintiff also had active accounts with Google and Meta.

31.    During Plaintiff's interactions on Nourish's Website, as described further herein, Nourish transferred to Google and Meta the Private Information of Plaintiff, including, for example, the name of Plaintiff's dietician, Plaintiff's insurance provider, the appointment time of Plaintiff's dietician appointment after sign up, and Plaintiff's page views on the Website.

32.    Along with these transmissions, as described further herein, Nourish also disclosed to Google and Meta information sufficient to allow them to identify Plaintiff as the person receiving medical care and scheduling appointments, including user IDs, cookies, device identifiers, and IP addresses.

33.    Nourish transferred this Private Information without Plaintiff's knowledge, consent, or express written authorization. By failing to receive the requisite consent, Nourish breached confidentiality and unlawfully disclosed Plaintiff's Private Information.

Defendant Nourish

34.    Defendant Nourish is incorporated in Delaware, and has a principal office and place of business located in this District at 257 Park Ave S., New York, New York 10010.

35.     Nourish promotes itself as "pair[ing] evidence-based nutrition counseling with technology that supports you on your health journey."[6] It operates as a fully online business.

36.     Nourish serves "hundreds of thousands of patients across all 50 states" and "employs more than 3,000 registered dietitians."[7]

37.     Nourish is a covered entity under the Health Insurance Portability and Accountability Act of 1996 (42 U.S.C. § 1320d and 45 C.F.R. Part 160-45 C.F.R. Part 162, and 45 C.F.R. Part 164 (HIPAA)).

38.     Nourish recognizes its duties under HIPAA in the "Nourish Info, Consent, HIPAA and Release Agreement," viewable when signing up.



---

[6] https://www.usenourish.com/about (last visited December 31, 2025).

[7]    https://www.fiercehealthcare.com/finance/nutrition-counseling-startup-nourish-clinches-70m-expand-services#:~:text=Nourish%20connects%20patients%20with%20registered,more%20than%203%2C000%20registered%20dietitians (last accessed January 4, 2026).

39.     Nourish acknowledges that it is "required by law to: [m]ake sure that protected health information ("PHI") that identifies you is kept private." Further, Nourish states that it "will not use or disclose your PHI for marketing purposes"[8] in compliance with the HIPAA Privacy Rule. The factual allegations in this complaint show otherwise.

## III.    JURISDICTION AND VENUE

40.     This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1332(d). The amount in controversy exceeds the sum of $5,000,000 exclusive of interest and costs, there are more than 100 proposed class members and at least one member of the class is a citizen of a state different from Nourish.

41.     Additionally, this Court also has subject matter jurisdiction over this action under 28 U.S.C. § 1331 because this Complaint asserts a claim for violation of federal law, specifically, the ECPA, 18 U.S.C. § 2511. This Court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) because all claims alleged herein form part of the same case or controversy.

42.     This Court has general personal jurisdiction over Defendant Nourish because Nourish is headquartered at 257 Park Ave S., New York, New York 10010, rendering it "at home" within this State and this District. Additionally, this Court has specific personal jurisdiction over Defendant Nourish because Nourish has availed itself of the rights and benefits of the State of New York, including by (1) targeting members of this District for subscription; (3) conducting substantial business in this District, and (4) perpetuating unlawful acts in this District.

43.     Nourish operates completely online. For Nourish to flourish, Nourish must be able to reach out to, and serve, as many people as possible nationwide. Individual state considerations

---

[8] https://www.usenourish.com/nourish-consent (last visited February 13, 2026).

must be factored into marketing decisions because Nourish's business model is to connect its members with clinicians who provide "evidence-based nutrition counseling."

44. Nourish boasts availability of clinicians in all 50 states, including New York. As such, Nourish anticipated that it would be subject to the laws of New York State to offer its services. Plaintiffs were directly targeted by Nourish in attempt to earn their business through online advertisements on various platforms, including, for example, Instagram, TikTok, Facebook, and streaming services.

45. Venue is proper in this District under 28 U.S.C. § 1391(b) because Nourish resides in this District and a substantial part of the events or omissions giving rise to this action occurred in this District.

## IV. FACTUAL ALLEGATIONS

### A. Background: Underlying Technology Employed by Nourish for the Purpose of Disclosing Plaintiffs' and Class Members' Private Information.

46. Nourish uses its Website to connect Plaintiffs and Class Members to Nourish's digital healthcare platforms with the goal of increasing profitability.

47. In furtherance of that goal, and to increase the success of its advertising and marketing, Nourish purposely installed the Pixels and Conversion tools to many of its webpages within its Website and on its servers, and programmed those webpages and servers. In doing so, Nourish surreptitiously shared patients' private and protected communications with Google and Meta; including communications that contain Plaintiffs' and Class Members' Private Information.

48. To better understand Nourish's unlawful data-sharing practices, a brief discussion of basic web design and tracking tools follows:

#### i. Examples of Specific Pixels installed by Nourish

1. Google Analytics

11

49.     Google Analytics is designed to capture and transmit a wide range of user interactions, including page views, search queries, button clicks, form submissions, transaction details, and error events, providing Nourish with real-time reporting on patient activity.

50.     By default, Google Analytics collects IP addresses, device/browser identifiers, and referral URLs, linking these with specific actions taken on the site. It further records acquisition data, showing whether a patient arrived via search, referral, or advertising, and engagement data, including the pages viewed, forms completed, and time spent on sensitive treatment-related pages.

51.     When a user schedules an appointment through the "find a dietician" option, the appointment time, selected state, and selected provider are captured and shared with Google.

52.     Google Analytics applies machine learning models to predict user behavior, such as the likelihood of completing an appointment request or abandoning a scheduling flow. Nourish's implementation therefore enabled the generation of predictive audiences tied to patients' healthcare interactions.

53.     The platform integrates with Google Ads, Display & Video 360, and Search Ads 360, allowing data collected from Nourish's healthcare website to be combined with Google's advertising systems for retargeting, attribution, and cross-platform campaign optimization.

54.     Google Analytics also enables conversion paths and attribution modeling, showing the steps patients took on Nourish's site before booking an appointment. This allows Google to evaluate the contribution of each click, referral, or ad impression in leading to a conversion, thereby exposing sensitive health-related pathways to external analysis.

2.   Google DoubleClick

12

55. Google DoubleClick is Google's advertising technology platform that enables advertisers to manage, deliver, and measure digital advertising campaigns. DoubleClick uses tracking pixels and cookies to collect information about users' browsing behavior across websites.

56. When a user visits a website that has DoubleClick tracking code installed, such as Nourish's Website, DoubleClick drops cookies on the user's browser to track their activity. These cookies allow DoubleClick to identify and track individual users as they move across different websites, building detailed profiles of their interests, behaviors, and demographics.

57. DoubleClick then uses this information to enable targeted advertising, allowing advertisers like Nourish to display ads to users based on their browsing history and inferred interests, including their visits to healthcare websites and the specific medical information they sought.

58. In other words, by employing DoubleClick to analyze patients' activity on the Website, Nourish could better target patients with ads based on their online behavior.

59. For example, if a patient searched for a dietician on the Website, DoubleClick could transmit that information to Nourish and link the information to the patient's Google account, allowing Nourish to later target that patient with specific ads related to his or her previous search.

60. The DoubleClick technology integrates seamlessly with Google Analytics, allowing Nourish to combine first-party data from their Website with DoubleClick's third-party advertising data to create comprehensive user profiles and implement sophisticated retargeting campaigns.

61. In exchange for disclosing the Private Information of their patients, Nourish is compensated by Google in the form of enhanced advertising services and more cost-efficient marketing.

### 3.   Google's Use of IDE Cookies to Identify Users.

62.     By choosing to install these Google tools, Nourish ensured that patients' activity on the Website was contemporaneously redirected to Google. This includes insurance information, appointment time, provider, and state.

63.     The IDE cookie is used to identify and track users across its advertising network and services. The IDE cookie is set by Google DoubleClick and stored under the domain doubleclick.net. The IDE cookie contains a unique identifier that Google DoubleClick uses to track users across websites that have implemented Google advertising services.

64.     When a user visits Nourish's Website with DoubleClick tracking code installed, the IDE cookie is either set on the user's browser (if not already present) or read from the user's browser (if previously set by visiting another website with DoubleClick tracking). This cookie allows Google to recognize that same user across multiple websites and track their browsing behavior over time.

65.     The IDE cookie enables Google to build comprehensive profiles of users' interests, behaviors, and demographics based on their activities across all websites in Google's advertising network.

66.     When Nourish transmit patients' Private Information to Google through their tools, Google can associate that health information with the specific individual identified by their IDE cookie value.

67.     Google tracks and stores every IDE cookie value associated with each user. Google maintains records linking these cookie values to specific user accounts, IP addresses, device identifiers, and other personal identification information. The information is then associated with

that individual's broader Google profile, which may include their name, email address, physical address, phone number, and comprehensive browsing history.

68.    Discovery in cases against Google, including *Calhoun v. Google* and *In re Google RTB Consumer Privacy Litigation*,[9] which have been made public, have shown that Google can identify users based on the IDE cookie and users' Client ID or "cid." The Client ID is a parameter in the URL string in the Google Analytics query string called "cid."

69.    Internally, Google refers to the IDE cookie as "Biscotti" and the Google User ID as "GAIA." Documents found in the *Calhoun* case revealed that Google internally maps the Client ID to the Biscotti ID, the Zwieback ID, and the GAIA ID.[10] Thus, Google can trace a transmission from Google Analytics or DoubleClick to an individual person who uses Google.

70.    Because Google has the ability to trace a transmission from Google Analytics or DoubleClick to an individual person, these transmissions are PHI when they relate to the past, present, or future health condition of an individual or the provision of health care to an individual.

71.    When Plaintiffs and Class Members visited Nourish's Website, they did not consent to third-party cookies being placed on their browsers to track their medical activities and link that information to their personal identities through Google's advertising network.

72.    Google uses the IDE cookies in combination with other identifiers, including IP addresses and device fingerprints, to create persistent user profiles that follow individuals across devices and over time. Even if a user clears their cookies or uses a different device, Google can

---

[9] *Calhoun v. Google*, N.D. Cal., No. 20-cv-05146; In re Google RTB Consumer Privacy Litigation, N.D. Cal, No. 21-cv-02155. Discovery from Google and expert reports from Professor Zubair Shafiq explaining those documents were used by Plaintiffs in both cases.

[10] *Calhoun v. Google*, N.D. Cal., No. 20-cv-05146, Dkt. No. 551-3, Ex. EEE, Rebuttal Report of Professor Zubair Shafiq, pp. 149-150 of 435; Dkt. 730-3, Zubair Decl., pp. 4-5 (explaining how Google internally names identifiers and to which cookies/information those identifiers correspond).

often re-identify them through cross-device tracking techniques that analyze behavioral patterns and associated account information.

73.    By installing Google Analytics and DoubleClick tracking code on the Website, Nourish enabled Google to drop the IDE cookies on Plaintiffs' and Class Members' browsers, thereby allowing Google to identify them personally, track their medical activities on the Website, and link that sensitive health information to their persistent Google profiles.

74.    The information transmitted alongside the IDE cookies included the specific webpages Plaintiffs and Class Members visited on Nourish's Website, the buttons they clicked, the forms they filled out, the medical conditions they searched for, the physicians they sought to contact, and the appointments they scheduled. All of this Private Information was transmitted to Google with the unique identifiers contained in the IDE cookie, allowing Google to know precisely which individual was seeking which type of medical care.

75.    Google uses the data collected through the IDE, including the Private Information disclosed by Nourish, for multiple commercial purposes, including: (a) building detailed user profiles for targeted advertising; (b) measuring advertising campaign effectiveness; (c) selling audience segments to advertisers; (d) improving Google's machine learning algorithms; and (e) enhancing Google's competitive position in the digital advertising market.

76.    The combination of Google Analytics, DoubleClick tracking, and the IDE cookie creates a comprehensive surveillance system that follows users across the internet, collecting and aggregating data about their most private activities, including their healthcare needs and medical conditions, all without meaningful notice or consent.

4.    Facebook (Meta)

16

77.     Meta Pixel (formerly Facebook Pixel) is one of Meta's most powerful advertising tools, "a new way to report and optimize for conversions, build audiences and get rich insights about how people use your website." According to Meta, to use Meta Pixel an advertiser need only "place a single pixel across [its] entire website to report and optimize for conversions" so that the advertiser could "measure the effectiveness of [its] advertising by understanding the action people take on [its] website."[11]

78.     The Meta Pixel is code embedded on a third-party website that tracks users' activity as the users navigate through a website. The code embedded in the page transmits information about the user's activity on the website while the exchange of the communication between the user and website provider is still occurring.

79.     When a user schedules an appointment through the "find a dietician" option, the appointment time, selected state, and selected provider are captured.

80.     The Meta Pixel sends each of these pieces of information to Meta with other identifiable information, such as the user's IP address. Meta stores this data on its own server for an unknown length of time, possibly years.

81.     This data is often associated with the individual user's Facebook account, including when the user is logged into their Facebook Account while visiting Nourish's Website. This allows Meta to link the data collected to the specific user. By way of example, Meta uses a cookie "c_user" to identify its account holders, which is stored or updated every time a person accesses their Facebook account from the same web browser. The Meta Pixel uses this cookie to send the user's Facebook ID to Meta. The "c_user" cookie value, and the Facebook ID, are unique to each

---

[11] Cecile Ho, Announcing Facebook Pixel, META (Oct. 14, 2015) https://developers.facebook.com/ads/blog/post/v2/2015/10/14/announcing-facebook-pixel/.

individual user. Through the "c_user" cookie and the Facebook ID, a user's Facebook profile, and all personal information included therein, is connected to their activity on Nourish's website.

82.    Meta can link user data to individual users through identifying information collected through Meta Pixel using what Meta calls "Advanced Matching" to match users with their Facebook accounts. Advanced Matching is either achieved manually or automatically (that is, data is either sent manually by the website developer, or automatically by the pixel identifying recognizable fields, such as name and email address).

83.    Importantly, even if there is no match because the user does not have a Facebook account, Meta still retains and uses the data collected. These non-users are referred to as having "shadow profiles" with Meta.[12]

84.    Once the data intercepted through the Meta Pixel is processed, the data is available through Meta's Events Manager and Ads Manager pages. Meta also provides the tools and analytics that allow the individuals to be reached again through future advertisements. Developers can also use this information to create "custom audiences" based on their desired criteria.[13]

85.    In addition to using the data intercepted through Meta Pixel to provide analytics services, Meta also uses the data collected for its own benefit, improving its personalized content delivery, advertising network, and machine-learning algorithms, refining its ability to identify and target users.

86.    Meta has no way to limit or prohibit the use of data collected through Meta Pixel given Meta's open systems and advanced algorithms.

---

[12] Jürgen Graf, Investigating shadow profiles: The data of others, TECHXPLORE (Sept. 22, 2023) https://techxplore.com/news/2023-09-shadow-profiles.html.

[13] https://developers.facebook.com/docs/app-events/overview (last visited Mar. 10, 2026); *see also* https://developers.facebook.com/docs/audience-network/ (last visited Mar. 10, 2026).

87.     According to leaked internal Meta documents, one employee explained that Meta's systems were built "with open borders." "Imagine you hold a bottle of ink in your hand. This bottle of ink is a mixture of all kinds of user data (3PD [third-party data], 1PD [first-party data], SCD [sensitive categories data], Europe, etc.)[.] You pour that ink into a lake of water (our open data systems; our open culture) . . . and it flows . . . everywhere . . . How do you put that ink back in the bottle? How do you organize it again, such that it only flows to the allowed places in the lake?"[14]

88.     In these same leaked documents, another employee explained Meta does "not have an adequate level of control and explainability over how our systems use data, and thus we can't confidently make controlled policy changes or external commitments such as 'we will not use X data for Y purpose.' And yet, that is exactly what regulators expect us to do, increasing our risk of mistakes and misrepresentation."[15] Thus, once data is in Meta's possession, there is no way to trace it back, and it is usable for analysis and advertisements, and any other use Meta deigns appropriate. An ounce of prevention is worth a pound of cure – the only way to ensure PHI, IIHI, and PII is not used inappropriately is to not share it without consent in the first instance. No one at Meta can explain where all user data is stored and used.[16]

---

[14] Lorenzo Franceschi-Bicchierai, Facebook Doesn't Know What It Does With Your Data, Or Where It Goes: Leaked Document, VICE, (Apr. 26, 2022) https://www.vice.com/en/article/facebook-doesnt-know-what-it-does-with-your-data-or-where-it-goes/

[15] *Id.*

[16] Isobel Asher Hamilton, Senior Facebook engineers say no one at the company knows where your data is kept, BUSINESS INSIDER, (Sept. 8. 2022) https://www.businessinsider.com/meta-doesnt-know-where-all-your-data-is-engineers-say-2022-9#:~:text=Two%20Meta%20engineers%20were%20grilled,there%20for%20almost%20nine%20years.

89.     Nourish chose to install Meta Pixel on its Website to capture user activity for its own gain, including the disclosure of Private Information. Nourish did so without disclosure and consent from Plaintiffs and Class Members.

90.     At all times relevant to this action, Plaintiffs had an active Facebook account at the time they used Nourish's website and services. Plaintiffs accessed Nourish's Website from the same device they used to visit Facebook, and Meta associated the data it collected about them from Nourish's Website with their Facebook account and other PHI and IIHI.

### ii.   Nourish Chose to Install Pixels on Particular Pages

91.     Notably, the transmission of information occurs on webpages that contain the Pixels. A website owner can configure its website to use the Pixels on certain webpages that don't implicate privacy (such as the "find a provider" page, so long as specific information is not shared). Thus, Plaintiffs' and Class Members' Private Information would not have been disclosed to Google and Meta via the Pixel but for Nourish's decisions to install the Pixels on its Website and specifically on the webpages that solicit and receive Private Information.

92.     Similarly, Plaintiffs' and Class Members' Private Information would not have been disclosed to Google and Meta via the Pixels but for Nourish's decision to install and implement them on its servers.

93.     By installing and implementing the Pixels, Nourish caused Plaintiffs' and Class Members' communications to be intercepted and transmitted from Plaintiffs' and Class Members' browsers directly to Google and Meta via the Pixels.

### iii.   Nourish's Methods of Transmitting Plaintiffs' and Class Members' Private Information via the Tracking Pixels i.e., the Interplay between HTTP Requests and Responses, Source Code, and the Pixel

20

94.    Web browsers are software applications that allow consumers to navigate the internet and view and exchange electronic information and communications. Each "client device" (such as computer, tablet, or smart phone) accessed web content through a web browser (e.g., Google's Chrome browser, Mozilla's Firefox browser, Apple's Safari browser, and Microsoft's Edge browser).

95.    Every website is hosted by a computer "server" that holds the website's contents and through which the website owner exchanges files or communications with Internet users' client devices via their web browsers.

96.    Web communications consist of HTTP or HTTPS Requests and HTTP or HTTPS Responses. Any given browsing session may consist of thousands of individual HTTP Requests and HTTP Responses, along with corresponding cookies[17]:

  a. **HTTP Request**: an electronic communication sent from the client device's browser to the website's server. GET Requests are one of the most common types of HTTP Requests. In addition to specifying a particular URL (i.e., web address), GET Requests can also send data to the host server embedded inside the URL, and can include cookies. POST Requests are a separate type of HTTP Request that can send a large amount of data outside of the URL (e.g., uploading a PDF to a court's ECF system for filing a motion).

---

[17] "Cookies are small files of information that a web server generates and sends to a web browser. …Cookies help inform websites about the user, enabling the websites to personalize the user experience." https://www.cloudflare.com/learning/privacy/what-are-cookies/ (last visited August 22, 2025).

b. **Cookies**: a small text file that can be used to store information on the client device which can later be communicated to a server or servers. Cookies that have been placed on the client device are sent with HTTP Requests from client devices to the host server. Some cookies are "third-party cookies" which means they can store and communicate data to the cookie owner's website when the user is visiting an entirely different website.

c. **HTTP Response**: an electronic communication that is sent as a reply to the client device's web browser from the host server in response to an HTTP Request. HTTP Responses may consist of a web page, another kind of file, text information, or error codes, among other data.[18] HTTP Responses can also send cookies or other code hidden and embedded in the webpage to the client device's browser.

97.     When an individual visits Nourish's Website, an HTTP Request is sent from that individual's web browser to Nourish's servers that essentially asks Nourish's Website to retrieve certain information (such as Nourish's "Find a Dietician" page). The HTTP Response from Nourish's servers sends the requested information in the form of "Markup." This is the foundation for the pages, images, words, buttons, and other features that appear on the patient's screen as they navigate Nourish's Website.

---

[18] One browsing session may consist of hundreds or thousands of individual HTTP Requests and HTTP Responses.

98.     Every website is comprised of Markup and "Source Code." Source Code is simply a set of instructions that commands the website visitor's browser to take certain actions when the web page first loads or when a specified event triggers the code.

99.     Source code may also command a web browser to send data transmissions to third parties in the form of HTTP Requests quietly executed in the background without notifying the web browser's user. Nourish's customized implementation of the Pixels is source code that does just that. The Pixels act much like a traditional wiretap. When patients visit Nourish's Website via an HTTP Request to Nourish's server, Nourish's server sends an HTTP Response including the Markup that displays the Webpage visible to the user along with Source Code that includes Nourish's Pixel. This Source Code is then stored in the user's RAM on the user's device.

100.    In essence, Nourish is handing patients a bugged phone. Once the Webpage loads in the patient's browser, the software-based wiretap quietly waits for a communication from the patient to trigger the tap, which intercepts those communications intended only for Nourish and transmits them to third-parties, including Google and Meta.

101.    Separate from the Pixels, other website owners can place third party cookies in the web browsers of users logged into their websites or services. These cookies can uniquely identify the user so the cookie owner can track the user as she moves around the internet—whether on the cookie owner's website or not. Google and Meta use this type of third-party cookie when users that are account holders use their app or website. As a result, when a Google and Meta account holder uses Nourish's Website, a unique ID is sent to Google and Meta along with the user's device fingerprint and the intercepted communication that allows Google and Meta to identify the patient associated with the Private Information it has intercepted.

102.    With substantial work and technical know-how, internet users can sometimes circumvent this browser-based wiretap technology. To counteract this, third parties bent on gathering data and Private Information implement workarounds that are difficult to detect or evade. Nourish states outright in its privacy policy that it, as an example, still tracks even when told not to do so, stating: "Please note that we do not alter our Site's data collection and use practices when we see a Do Not Track signal from your browser."[19]

103.    The third parties to whom a website transmits data through the Pixels do not provide any substantive content on the host website. In other words, Google and Meta and others like it are not providing anything to the user relating to the user's communications. Instead, these third parties are typically procured to track user data and communications only to serve the marketing purposes of the website owner (i.e., to bolster profits).

104.    Thus, without any knowledge, authorization, or action by a user, a website owner like Nourish can use its Source Code to commandeer its patients' computing devices, causing the device's web browser to contemporaneously and invisibly re-direct the patients' communications to hidden third parties like Google and Meta.

105.    In this case, Nourish employed the Pixels to intercept, duplicate, and re-direct Plaintiffs' and Class Members' Private Information to Google and Meta.

106.    For example, when a patient visits Nourish's Website and selects the "Find a Dietician" button, the patient's browser automatically sends an HTTP Request to Nourish's web server, which automatically returns an HTTP Response and loads the Markup for that particular webpage as depicted below.

---

[19] https://www.usenourish.com/privacy (last visited January 8, 2026).



The patient visiting this particular web page only sees the Markup, not Nourish's Source Code or underlying HTTP Requests and Responses.

107.    The Pixels are embedded in Nourish's Source Code sent in its HTTP Response to consumers' client devices and ran on their browsers. The Pixels, programmed to automatically track and transmit the patient's communications with Nourish's Website to Google and Meta, execute instructions that effectively open a hidden spying window into the patient's browser through which Google and Meta can intercept the visitor's data, actions, and communications with Nourish.[20]

108.    Thus, Nourish's Source Code containing the Pixel manipulates the patient's browser by secretly instructing it to duplicate the patient's communications (HTTP Requests) with Nourish and sends the communications to Google and Meta.

109.    This communication to Google and Meta occurs contemporaneously, invisibly, and without the patient's knowledge.

110.    Thus, without its patients' consent, Nourish has effectively used its source code to commandeer and "bug" or "tap" patients' computing devices, allowing Google and Meta to listen

---

[20] When used in the context of a screen or visual display, a "pixel" is the smallest unit in such a digital display. An image or video on a device's screen can be made up of millions of individual pixels.

in on all of their communications with Nourish and thereby intercept those communications, including Private Information.

111.    Consequently, when Plaintiffs and Class Members visit Nourish's website and communicate their Private Information, including, but not limited to, provider identity and page views, it is simultaneously intercepted and transmitted to Google and Meta. The type of information shared via each pixel is shown in the following paragraphs. Paragraphs 113-115 are from the mobile browser. Paragraphs 116-117 are from the desktop browser.

112.    On the mobile browser, Meta receives information about page views and button click events. When a user schedules an appointment via the "find a dietician" option, the appointment time, selected state, and selected provider are captured and disclosed to Meta.

| Request URL | https://www.facebook.com/tr/?id=468023873966197&ev=PageView&dl=https%3A%2F%2Fsignup.usenourish.com%2Fproviders%2Fkristina-von-castel&rl=https%3A%2F%2Fwww.usenourish.com%2F&if=false&ts=1765567479631&sw=375&sh=667&v=2.9.247&r=stable&ec=1&o=4126&fbp=fb.1.1764945059225.6998603043356166914&cs_est=true&ler=other&plt=625&it=1765567479628&coo=false&expv2[0]=pl0&expv2[1]=el3&expv2[2]=bc1&expv2[3]=mr0&rqm=GET |
|---|---|
| dl | https://signup.usenourish.com/1?insuranceCompany=Blue+Cross+Blue+Shield+Companies&addressState=FL&specialty=_removed_&fromProviderDirectory=true&providerId=9885&appointmentTime=2025-12-16T15%3A00%3A00.000Z |

113.    On the mobile browser, Google Doubleclick tracks page views and, when a user schedules an appointment via the "find a dietician" option, the insurance provider, the appointment time, selected state, and selected provider are captured.

Request URL

```
https://googleads.g.doubleclick.net/pagead/viewthroughconversion/308377294/?random=1
765567720348&cv=11&fst=1765567720348&bg=ffffff&guid=ON&async=1&en=form_start
&gtm=45be5ca1h1v888190540za20gzb867659916zd867659916xec&gcd=13l3l3l3l1l1&dma
=0&tag_exp=102015666~103116026~103200004~104527906~104528500~104684208~104
684211~105391253~115583767~115938466~115938468~116184927~116184929~1162176
36~116217638~116251938~116251940~116682875~116744866&u_w=375&u_h=667&url=
https%3A%2F%2Fsignup.usenourish.com%2F1%3FinsuranceCompany%3DBlue%2BCross%2B
Blue%2BShield%2BCompanies%26addressState%3DFL%26specialty%3D11%26fromProvider
Directory%3Dtrue%26providerId%3D9885%26appointmentTime%3D2025-12-16T15%253A0
0%253A00.000Z&ref=https%3A%2F%2Fsignup.usenourish.com%2Fproviders%2Fkristina-von
-castel&frm=0&tiba=Sign%20Up%20%7C%20Nourish&hn=www.googleadservices.com&np
a=0&pscdl=noapi&auid=794972834.1764945059&data=event%3Dform_start&rfmt=3&fmt
=4
```

114.    On the mobile browser, Google Analytics tracks page views and, when a user schedules an appointment via the "find a dietician" option, the appointment time, selected state, and selected provider are captured.

Request URL

```
https://www.google-analytics.com/g/collect?v=2&tid=G-D5JKFDJ123&gtm=45
je5ca1h1v881614539za20gzb867659916zd867659916&_p=1765567471627&gc
d=13l3l3l3l1l1&npa=0&dma=0&cid=1077239168.1764945059&ul=en-us&sr=
375x667&frm=0&pscdl=noapi&_eu=AEAAAAQ&_s=2&tag_exp=103116026~1
03200004~104527906~104528501~104684208~104684211~105391252~1155
83767~115938466~115938468~116184927~116184929~116217636~1162176
38~116251938~116251940~116682875~116744866&dl=https%3A%2F%2Fsig
nup.usenourish.com%2Fproviders%2Fkristina-von-castel&dr=https%3A%2F%2
Fsignup.usenourish.com%2Fproviders%3F_stsgnoredir%3D1%26_configname%
3Dprovider_directory_100_redirect%26landingPageVariation%3DOrganic_Home
page%26InsuranceSearchInput%3Dfalse%26page%3D1&sid=1765567463&sct
=2&seg=1&dt=Nourish%20%7C%20Dietitian%20Nutritionist%20%7C%20Kristi
na%20von%20Castel&en=page_view&_et=8416&tfd=15892
```

115.    On the desktop browser, Meta receives information about page views and button click events. Further, when a user schedules an appointment via the "find a dietician" option, the appointment time, selected state, and selected provider are captured.

27

```
https://www.facebook.com/privacy_sandbox/pixel/register/trigger/?id=468023873966197&ev=PageView&dl=https%3A%2F%2Fsignup.usenourish.co
m%2F1%3F_stsgnoredir%3D1%26_configname%3Dprovider_directory_100_redirect%26landingPageVariation%3DOrganic_Homepage%26InsuranceSearc
hInput%3Dfalse%26_gl%3D1*1uz40e4*_gcl_aw*R0NMLjE3NzI0NzA5NTEuQ2p3S0NBaUFoNVhOQmhBQUVppd0FfQnU4RlpQV1B0QjFWUDZaM0xGWUFYV
Whzbi1GZERhbGVidC0xdUlwMVVTY014ZTA5XzdGSEpURnFSb0NzT1FRQXZEX0J3RQ..*_gcl_au*MTIzMDQ5MDI5Ny4xNzcyNDcwMTQy%26page%3D1%26
addressState%3DFL%26fromProviderDirectory%3Dtrue%26providerId%3D15741%26appointmentTime%3D2026-03-04T17%253A00%253A00.000Z&rl=
https%3A%2F%2Fsignup.usenourish.com%2Fproviders%3F_stsgnoredir%3D1%26_configname%3Dprovider_directory_100_redirect%26landingPageVariat
ion%3DOrganic_Homepage%26InsuranceSearchInput%3Dfalse%26_gl%3D1*1uz40e4*_gcl_aw*R0NMLjE3NzI0NzA5NTEuQ2p3S0NBaUFoNVhOQmhBQU
Vpd0FfQnU4RlpQV1B0QjFWUDZaM0xGWUFYVWhzbi1GZERhbGVidC0xdUlwMVVTY014ZTA5XzdGSEpURnFSb0NzT1FRQXZEX0J3RQ..*_gcl_au*MTIzMDQ
5MDI5Ny4xNzcyNDcwMTQy%26page%3D1&if=false&ts=1772563868793&sw=2048&sh=1152&v=2.9.274&r=stable&ec=1&o=12318&fbp=fb.1.17724
70143494.42913389925757783&cs_est=true&ler=other&cdl=API_unavailable&plt=634.0999999940395&it=1772563868787&coo=false&expv2[0]=pl1&
expv2[1]=el3&expv2[2]=bc1&expv2[3]=ra0&expv2[4]=rp0&expv2[5]=ct3&expv2[6]=hf1&rqm=FGET
```

116.    On the desktop browser, Google DoubleClick pixel shares conversions, page views, and form submit events. Google Analytics shares the same. When a user schedules an appointment via the "find a dietician" option, the appointment time, selected state, and selected provider are captured.

```
https://googleads.g.doubleclick.net/pagead/viewthroughconversion/308377294/?random=1772563869790&cv=11&fst=1772563869790&bg=ffffff&gui
d=ON&async=1&en=page_view&gtm=45be6320v888190540za20gzb867659916zd867659916xec&gcd=13l3l3l3l1l1&dma=0&tag_exp=103116026~10
3200004~104527907~104528500~104684208~104684211~115938465~115938469~116024733~117484252&u_w=2048&u_h=1152&url=https%3A%2
F%2Fsignup.usenourish.com%2F1%3F_stsgnoredir%3D1%26_configname%3Dprovider_directory_100_redirect%26landingPageVariation%3DOrganic_Ho
mepage%26InsuranceSearchInput%3Dfalse%26_gl%3D1*1uz40e4*_gcl_aw*R0NMLjE3NzI0NzA5NTEuQ2p3S0NBaUFoNVhOQmhBQUVppd0FfQnU4RlpQV
1B0QjFWUDZaM0xGWUFYVWhzbi1GZERhbGVidC0xdUlwMVVTY014ZTA5XzdGSEpURnFSb0NzT1FRQXZEX0J3RQ..*_gcl_au*MTIzMDQ5MDI5Ny4xNzcyND
cwMTQy%26page%3D1%26addressState%3DFL%26fromProviderDirectory%3Dtrue%26providerId%3D15741%26appointmentTime%3D2026-03-04T17%
253A00%253A00.000Z&ref=https%3A%2F%2Fsignup.usenourish.com%2Fproviders%2Fjacqueline-aizen%3F_stsgnoredir%3D1%26_configname%3Dprov
ider_directory_100_redirect%26landingPageVariation%3DOrganic_Homepage%26InsuranceSearchInput%3Dfalse%26_gl%3D1*1uz40e4*_gcl_aw*R0NMLj
E3NzI0NzA5NTEuQ2p3S0NBaUFoNVhOQmhBQUVpd0FfQnU4RlpQV1B0QjFWUDZaM0xGWUFYVWhzbi1GZERhbGVidC0xdUlwMVVTY014ZTA5XzdGSEpU
RnFSb0NzT1FRQXZEX0J3RQ..*_gcl_au*MTIzMDQ5MDI5Ny4xNzcyNDcwMTQy%26page%3D1&frm=0&tiba=Sign%20Up%20%7C%20Nourish&hn=www.
googleadservices.com&npa=0&us_privacy=1-N-&pscdl=noapi&auid=1230490297.1772470142&uaa=x86&uab=64&uafvl=Not%253AA-Brand%3B99.0.
0.0%7CGoogle%2520Chrome%3B145.0.7632.117%7CChromium%3B145.0.7632.117&uamb=0&uam=&uap=Windows&uapv=19.0.0&uaw=0&data=eve
nt%3Dpage_view&rfmt=3&fmt=4
```

| | |
|---|---|
| url | https://signup.usenourish.com/1?_stsgnoredir=1&_configname=provider_directory_100_redirect&landingPageVariation=Organic_Homepage&InsuranceSearchInput=false&_gl=1*1uz40e4*_gcl_aw*R0NMLjE3NzI0NzA5NTEuQ2p3S0NBaUFoNVhOQmhBQUVpd0FfQnU4RlpQV1B0QjFWUDZaM0xGWUFYVWhzbi1GZERhbGVidC0xdUlwMVVTY014ZTA5XzdGSEpURnFSb0NzT1FRQXZEX0J3RQ..*_gcl_au*MTIzMDQ5MDI5Ny4xNzcyNDcwMTQy&page=1&addressState=FL&fromProviderDirectory=true&providerId=15741&appointmentTime=2026-03-04T17%3A00%3A00.000Z |
| ref | https://signup.usenourish.com/providers/jacqueline-aizen?_stsgnoredir=1&_configname=provider_directory_100_redirect&landingPageVariation=Organic_Homepage&InsuranceSearchInput=false&_gl=1*1uz40e4*_gcl_aw*R0NMLjE3NzI0NzA5NTEuQ2p3S0NBaUFoNVhOQmhBQUVpd0FfQnU4RlpQV1B0QjFWUDZaM0xGWUFYVWhzbi1GZERhbGVidC0xdUlwMVVTY014ZTA5XzdGSEpURnFSb0NzT1FRQXZEX0J3RQ..*_gcl_au*MTIzMDQ5MDI5Ny4xNzcyNDcwMTQy&page=1 |

28

https://www.google-analytics.com/g/collect?v=2&tid=G-D5JKFDJ123&gtm=45je6320v881614539za20gzb867659916zd867659916&_p=1772563842807&gcd=13l3l3l3l11l1&npa=0&dma=0&cid=207557553.1772470143&ul=en-us&sr=2048x1152&uaa=x86&uab=64&uafvl=Not%253AA-Brand%3B99.0.0.0%7CGoogle%2520Chrome%3B145.0.7632.117%7CChromium%3B145.0.7632.117&uamb=0&uam=&uap=Windows&uapv=19.0.0&uaw=0&are=1&frm=0&pscdl=noapi&_eu=AEAAAAQ&_s=2&tag_exp=103116026~103200004~104527907~104528501~104684208~104684211~115616985~115938465~115938468~116024733~117484252~117755070&dl=https%3A%2F%2Fsignup.usenourish.com%2F1%3F_stsgnoredir%3D1%26_configname%3Dprovider_directory_100_redirect%26landingPageVariation%3DOrganic_Homepage%26InsuranceSearchInput%3Dfalse%26_gl%3D1*1uz40e4*_gcl_aw*R0NMLjE3NzI0NzA5NTEuQ2p3S0NBaUFoNVhOQmhBQUVpd0FfQnU4RlpQV1B0QjFWUDZaM0xGWUFYYWhzbi1GZERhbGVidC0xdUlwMVVTY014ZTA5XzdGSEpURn FSb0NzT1FRQXZEX0J3RQ..*_gcl_au*MTIzMDQ5MDI5Ny4xNzcyNDcwMTQy%26page%3D1%26addressState%3DFL%26fromProviderDirectory%3Dtrue%26providerId%3D157418%26appointmentTime%3D2026-03-04T17%253A00%253A00.000Z&dr=https%3A%2F%2Fsignup.usenourish.com%2Fproviders%2Fjacqueline-aizen%3F_stsgnoredir%3D1%26_configname%3Dprovider_directory_100_redirect%26landingPageVariation%3DOrganic_Homepage%26InsuranceSearchInput%3Dfalse%26_gl%3D1*1uz40e4*_gcl_aw*R0NMLjE3NzI0NzA5NTEuQ2p3S0NBaUFoNVhOQmhBQUVpd0FfQnU4RlpQV1B0QjFWUDZaM0xGWUFYYWhzbi1GZERhbGVidC0xdUlwMVVTY014ZTA5XzdGSEpURnFSb0NzT1FRQXZEX0J3RQ..*_gcl_au*MTIzMDQ5MDI5Ny4xNzcyNDcwMTQy%26page%3D1&sid=1772563081&sct=2&seg=1&dt=Sign%20Up%20%7C%20Nourish&en=page_view&_et=9413&tfd=29620

| | |
|---|---|
| dl | https://signup.usenourish.com/1?_stsgnoredir=1&_configname=provider_directory_100_redirect&landingPageVariation=Organic_Homepage&InsuranceSearchInput=false&_gl=1*1uz40e4*_gcl_aw*R0NMLjE3NzI0NzA5NTEuQ2p3S0NBaUFoNVhOQmhBQUVpd0FfQnU4RlpQV1B0QjFWUDZaM0xGWUFYYWhzbi1GZERhbGVidC0xdUlwMVVTY014ZTA5XzdGSEpURnFSb0NzT1FRQXZEX0J3RQ..*_gcl_au*MTIzMDQ5MDI5Ny4xNzcyNDcwMTQy&page=1&addressState=FL&fromProviderDirectory=true&providerId=157418&appointmentTime=2026-03-04T17%3A00%3A00.000Z |
| dr | https://signup.usenourish.com/providers/jacqueline-aizen?_stsgnoredir=1&_configname=provider_directory_100_redirect&landingPageVariation=Organic_Homepage&InsuranceSearchInput=false&_gl=1*1uz40e4*_gcl_aw*R0NMLjE3NzI0NzA5NTEuQ2p3S0NBaUFoNVhOQmhBQUVpd0FfQnU4RlpQV1B0QjFWUDZaM0xGWUFYYWhzbi1GZERhbGVidC0xdUlwMVVTY014ZTA5XzdGSEpURnFSb0NzT1FRQXZEX0J3RQ..*_gcl_au*MTIzMDQ5MDI5Ny4xNzcyNDcwMTQy&page=1 |

117.    These URLs denote HTTP requests sent by Nourish's source code through consumers' client devices to third-party servers.  Worse, the requests send private information embedded within the URL, rendering that data insecure and easy for further, unintended third-parties to intercept the communications.

**B. Nourish Acted to Purposefully Violate HIPAA When It Disclosed Plaintiffs' and Class Members' Private Information to Google and Meta Using the Pixels.**

118.    Nourish utilizes the Pixels on its Website to secretly track patients by recording their activity and experiences in violation of its common law, contractual, statutory, and regulatory duties and obligations.

119.    The Pixels have their own unique identifiers which can be used to identify which of Nourish's webpages contain the Pixels.

120.    The Pixels allow Nourish to optimize the delivery of ads, measure cross device conversions, create custom audiences, and decrease advertising and marketing costs. However, Nourish's Website does not rely on the Pixel to function.

121.    While seeking and using Nourish's services as a medical provider, Plaintiffs and Class Members communicated their Private Information to Nourish via its Website.

122.     Plaintiffs and Class Members were not aware that their Private Information would be shared with Google and Meta as it was communicated to Nourish because, amongst other things, Nourish did not disclose this fact.

123.     Nourish, like any other "covered entity[,] must obtain an authorization for any use or disclosure of protected health information for marketing." 45 C.F.R. § 164.508(a)(3)(i).

124.     Valid authorization is outlined in 45 C.F.R. § 164.508, and "[w]hen a covered entity obtains or receives a valid authorization for its use or disclosure of protected health information, such use or disclosure must be consistent with such authorization."

125.     One of the requirements for a valid authorization is that "[t]he authorization must be written in plain language." *Id.* at 164.508(c)(3).

126.     In Nourish's "Info, Consent, HIPAA and Release Agreement," which purports to serve as the HIPAA authorization for all activity with Nourish, Nourish steps through its HIPAA duties. Nourish specifically acknowledges the prohibition on using PHI for marketing purposes. Nourish explicitly informs Plaintiffs and Class Members that Nourish "will not use or disclose your PHI for marketing purposes."[21]

127.     At no point does Nourish, in plain language, divulge that Plaintiffs' and Class Members' Private Information will be disclosed to Google and/or Meta.

128.     As outlined, Nourish publicized its understanding that it is required to protect, and prohibited from disclosing, Plaintiffs' and Class Members' Private Information without valid authorization, especially from use for marketing purposes.

---

[21] https://www.usenourish.com/nourish-consent (last visited February 13, 2026); *see also* 45 C.F.R. § 164.508(a)(3) ("a covered entity must obtain an authorization for any use or disclosure of protected health information for marketing

129. By failing to do so, as explained *supra* 113-117, Nourish betrays that its primary motive in disclosing Private Information was to violate HIPAA.

130. Nourish needed to obtain *valid authorization* from Plaintiffs and Class Members to use their Private Information to make money.

131. Nourish failed to take these steps. In so failing, Nourish removed the possibility for Plaintiffs and Class Members to say *no*. At no point were Plaintiffs and Class Members afforded the opportunity to consent to Nourish's profiting off their Private Information.

132. Plaintiffs and Class Members never consented, agreed, authorized, or otherwise permitted Nourish to disclose their Private Information to Google and Meta; nor did they intend for Google and Meta to be a party to their communications (many of them highly sensitive and confidential) with Nourish.

133. The Pixels sent non-public Private Information to Google and Meta, including but not limited to Plaintiffs' and Class Members' chosen provider. Indeed, Plaintiffs' status as patients is itself PHI. The affected non-public Private information includes insurance information, state, appointment time, and selected provider.

134. Importantly, the Private Information the Pixels sent to Google and Meta was sent alongside the Plaintiffs' and Class Members' cookies, device identifiers, and IP addresses, thereby allowing individual patients' communications with Nourish, and the Private Information contained in those communications, to be linked to their unique Google and Meta accounts and therefore their identity.

135. Nourish deprived Plaintiffs and Class Members of their privacy rights when it: (1) implemented third-party tracking technology (i.e., the Pixels) that surreptitiously tracked, recorded, and disclosed Plaintiffs' and other online patients' confidential communications and

Private Information; (2) disclosed patients' protected information to Google and Meta —each an unauthorized third-party; and (3) undertook this pattern of conduct without notifying Plaintiffs or Class Members and without obtaining their express written consent.

136.   Nourish does not disclose that the Pixels embedded in the Source Code for usenourish.com tracks and transmits Plaintiffs' and Class Members' Private Information to Google and Meta.

137.   Nourish does not disclose that the Pixels installed on the servers for the Website tracks, records, and transmits Plaintiffs' and Class Members' Private Information to Google and Meta.

138.   Nourish never received consent or written authorization to disclose to Google and Meta the Private Information entered by Plaintiffs and Class Members on the Website.

### i.   Plaintiff John Doe's Experiences

139.   John Doe has accounts with both Google and Facebook that contain his personally identifying information.

140.   On or around August 2025, Plaintiff John Doe used Nourish's website to create an account and schedule an appointment with a dietitian.

141.   When Plaintiff scheduled his appointment, Nourish disclosed Plaintiff's PHI to Google and Meta, including Plaintiff's insurance provider, the name of the dietitian with whom Plaintiff scheduled an appointment, the date of the appointment, and the time of the appointment. Along with this transmission of PHI, Nourish disclosed to Google and Meta information sufficient to allow them to identify Plaintiff as the person scheduling the appointment, including user IDs, cookies, device identifiers, and IP addresses.

142. Plaintiff has a continuing interest in ensuring that future communications with Nourish are protected and safeguarded from further unauthorized disclosure.

### ii.    Plaintiff Jane Doe 1's Experience.

143. Jane Doe 1 has accounts with both Google and Facebook that contain her personally identifying information.

144. On or around December 2025, Plaintiff Jane Doe 1 used Nourish's website to create an account and schedule an appointment with a dietitian.

145. When Plaintiff scheduled her appointment, Nourish disclosed Plaintiff's PHI to Google and Meta, including Plaintiff's insurance provider, the name of the dietitian with whom Plaintiff scheduled an appointment, the date of the appointment, and the time of the appointment. Along with this transmission of PHI, Nourish disclosed to Google and Meta information sufficient to allow them to identify Plaintiff as the person scheduling the appointment, including user IDs, cookies, device identifiers, and IP addresses.

146. Plaintiff has a continuing interest in ensuring that future communications with Nourish are protected and safeguarded from further unauthorized disclosure.

### iii.    Plaintiff Jane Doe 2's Experience.

147. Jane Doe 2 has accounts with both Google and Facebook that contain her personally identifying information.

148. On or around July 31, 2025, Plaintiff Jane Doe 2 used Nourish's website to create an account and schedule an appointment with a dietitian.

149. When Plaintiff scheduled her appointment, Nourish disclosed Plaintiff's PHI to Google and Meta, including Plaintiff's insurance provider, the name of the dietitian with whom Plaintiff scheduled an appointment, the date of the appointment, and the time of the appointment.

Along with this transmission of PHI, Nourish disclosed to Google and Meta information sufficient to allow them to identify Plaintiff as the person scheduling the appointment, including user IDs, cookies, device identifiers, and IP addresses.

150.    Plaintiff has a continuing interest in ensuring that future communications with Nourish are protected and safeguarded from further unauthorized disclosure.

### C. Nourish's Conduct is Unlawful and Violates Its Patients' Rights

#### i. Nourish violated HIPAA standards

151.    Under Federal Law, a healthcare provider may not disclose personally identifiable, non-public medical information about a patient, a potential patient, or household member of a patient for marketing purposes without the patients' express written authorization.[22]

152.    Guidance from the United States Department of Health and Human Services (the "Department") instructs healthcare providers that patient status alone is protected by HIPAA.

153.    In "Guidance Regarding Methods for De-identification of Protected Health Information in Accordance with the Health Insurance Portability and Accountability Act (HIPAA) Privacy Rule," the Department instructs:

> Identifying information alone, such as personal names, residential addresses, or phone numbers, would not necessarily be designated as PHI. For instance, if such information was reported as part of a publicly accessible data source, such as a phone book, then this information would not be PHI because it is not related to heath [sic] data . . . . If such information was listed with health condition, health care provision or payment data, such as an indication that the individual was treated at a certain clinic, then this information would be PHI.[23]

---

[22] HIPAA, 42 U.S.C. § 1320; 45 C.F.R. §§ 164.502; 164.508(a)(3), 164.514(b)(2)(i).

[23] https://www.hhs.gov/sites/default/files/ocr/privacy/hipaa/understanding/coveredentities/Deidentification/hhs_deid_guidance.pdf (last visited Mar. 10, 2026).

154.    In its guidance for marketing, the Department further instructs:

> The HIPAA Privacy Rule gives individuals important controls over whether and how their protected health information is used and disclosed for marketing purposes. With limited exceptions, the Rule requires an individual's written authorization before a use or disclosure of his or her protected health information can be made for marketing. … Simply put, a covered entity may not sell protected health information to a business associate or any other third party for that party's own purposes. Moreover, covered entities may not sell lists of patients to third parties without obtaining authorization from each person on the list. (Emphasis added).[24]

155.    In addition, the Office for Civil Rights (OCR) at the U.S. Department of Health and Human Services (HHS) has issued a bulletin to highlight the obligations of HIPAA-covered entities and business associates ("regulated entities") under the HIPAA Privacy, Security, and Breach Notification Rules ("HIPAA Rules") when using online tracking technologies ("tracking technologies").

156.    The bulletin expressly provides that "[r]egulated entities are not permitted to use tracking technologies in a manner that would result in impermissible disclosures of PHI to tracking technology vendors or any other violations of the HIPAA Rules."

157.    In other words, HHS has expressly stated that Nourish has violated HIPAA Rules by implementing the Pixels.

### ii.  Plaintiffs' and Class Members' Expectation of Privacy

158.    Plaintiffs and Class Members were aware of Nourish's duty of confidentiality when they sought medical services from Nourish.

159.    Indeed, at all times when Plaintiffs and Class Members provided their Private Information to Nourish, they all had a reasonable expectation that the information would remain

---

[24]https://www.hhs.gov/sites/default/files/ocr/privacy/hipaa/understanding/coveredentities/marketing.pdf (last visited Nov. 3, 2022).

private and that Nourish would not share the Private Information with third parties for a commercial purpose, unrelated to patient care.

### iii. IP Addresses, Cookies, and Device Identifiers, in this context, are Individually Identifiable Health Information

160. PHI is "individually identifiable health information," IIHI, that is maintained or transmitted by electronic media. 45 C.F.R. § 160.103. IIHI is (1) health information that is "created or received by a health care provider" that (2) relates to "past, present, or future" health conditions or provision of health care and (3) also either identifies an individual or "there is a reasonable basis to believe the information can be used to identify the individual." *Id.*

161. By using the Pixels on Nourish's Website, Nourish also disclosed and otherwise assisted the Google and Meta with intercepting Plaintiffs' and Class Members' computer IP addresses.

162. An IP address is a number that identifies the address of a device connected to the Internet.

163. IP addresses are used to identify and route communications on the Internet.

164. IP addresses of individual Internet users are used by Internet service providers, Websites, and third-party tracking companies to facilitate and track Internet communications.

165. Upon information and belief, the Google and Meta track every IP address ever associated with Google and Meta users. Google and Meta track IP addresses for use of targeting individual homes and their occupants with advertising.

166. Further, Google and Meta associate transmissions with the Pixels with particular cookies for each Pixel. The Meta Pixel uses "c_user" as explained in ¶ 82.

167. Google and Meta use the cookies, IP addresses, and device fingerprints associated with the Pixels to identify users of their services off of their websites, such as on Nourish's website.

36

168.    When taken together, there is a reasonable basis to believe that Google and Meta can identify Plaintiffs and Class Members with the transmissions of the Pixels on Nourish's website. Thus, the transmissions of the Pixels on Nourish's website constitute IIHI.

169.    45 C.F.R. § 164.514 (2) lists "Internet Protocol (IP) address numbers," and "[a]ny other unique identifying number, characteristic, or code," as data that cannot be present in health information for that data to be considered "de-identified" and thus "not individually identifiable health information."

### iv.  Nourish was Enriched and Benefitted from the Use of the Pixel and Unauthorized Disclosures.

170.    Nourish purposely violated HIPAA to avoid obtaining valid authorizations from Plaintiffs and Class Members as part of Nourish's registration and appointment flows. A secondary purpose of Nourish's HIPAA violations was to optimize the profits it could acquire through the unlawful disclosure and marketing of Plaintiffs' and Class Members' Private Information.

171.    In exchange for disclosing the Private Information of Plaintiffs and Class Members, Nourish is compensated by Google and Meta in the form of enhanced advertising services and more cost efficient marketing on its platform.

172.    Retargeting is a form of online marketing that targets users with ads based on their previous internet communications and interactions. Upon information and belief, as part of its marketing campaign, Nourish re-targeted Plaintiffs, Class Members, and potential patients.

173.    By utilizing the Pixels, the cost of advertising and retargeting was reduced, thereby benefiting Nourish.

### D.  Plaintiffs' and Class Members' Private Information Had Financial Value.

174.    Plaintiffs' and Class Members' data and Private Information have economic value. Google and Meta regularly use data that they acquire to create Core and Custom Audiences, as

well as Lookalike Audiences and then sells that information to advertising clients. Nourish seeks the benefit of analytics and targeting marketing, which it achieves by working with Google and Meta to obtain the data which gets advertised.

175.   Data harvesting is one of the fastest growing industries in the country, and consumer data is so valuable that it has been described as the "new oil." Conservative estimates suggest that in 2018, Internet companies earned $202 per American user from mining and selling data. That figure is only due to keep increasing; estimates for 2022 were as high as $434 per user, for a total of more than $200 billion industry wide.

176.   The value of health data in particular is well-known and has been reported on extensively in the media. For example, Time Magazine published an article in 2017 titled "How Your Medical Data Fuels a Hidden Multi-Billion Dollar Industry" in which it described the extensive market for health data and observed that the market for information was both lucrative and a significant risk to privacy.[25]

177.   Similarly, CNBC published an article in 2019 in which it observed that "[d]eidentified patient data has become its own small economy: There's a whole market of brokers who compile the data from providers and other health-care organizations and sell it to buyers."[26]

178.   Further, healthcare data brokers charge up to $125 per clinical data record, with electronic healthcare databases selling for up to $500,000.[27]

---

[25] See https://time.com/4588104/medical-data-industry/ (last visited August 22, 2025).

[26]   See   https://www.cnbc.com/2019/12/18/hospital-execs-say-theyre-flooded-with-requests-foryour-health-data.html (last visited August 22, 2025).

[27] Todd Zigrang & Jessica Bailey-Wheaton, Valuing Healthcare Data, THE VALUE EXAMINER (2023),   available   online   at: https://www.healthcapital.com/researchmaterialdocuments/publishedarticles/Valuing%20Healthc are%20Data.pdf

**TOLLING**

179. Any applicable statute of limitations has been tolled by the "delayed discovery" rule. Plaintiffs did not know (and had no way of knowing) that her PII and PHI was intercepted and unlawfully disclosed to Google and Meta because Nourish kept this information secret.

**CLASS ACTION ALLEGATIONS**

180. Plaintiffs brings this action on behalf of himself and on behalf of all other persons similarly situated ("the Class") pursuant to Rule 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure.

181. The Class that Plaintiffs seeks to represent is initially defined as follows:

> **All individuals residing in the United States who are, or were, customers of Nourish and used Nourish's Website.**

182. Plaintiff John Doe seeks to represent a New York sub-class initially defined as follows:

> **All individuals residing in the State of New York who are, or were, customers of Nourish and used Nourish's Website.**

183. Plaintiff Jane Doe 1 seeks to represent a Pennsylvania sub-class initially defined as follows:

> **All individuals residing in the State of Pennsylvania who are, or were, customers of Nourish and used Nourish's Website.**

184. Plaintiff Jane Doe 2 seeks to represent a Florida sub-class initially defined as follows:

> **All individuals residing in the State of Florida who are, or were, customers of Nourish and used Nourish's Website.**

185. The nationwide class and sub-classes are collectively referred to as the "Classes." Excluded from the Classes are Nourish, its agents, affiliates, parents, subsidiaries, any entity in

which Nourish has a controlling interest, any Nourish officer or director, any successor or assign, and any Judge who adjudicates this case, including their staff and immediate family.

186. Plaintiffs reserve the right to modify, amend, expand, or narrow the definition of the proposed class, or to add additional classes or subclasses, before the Court determines whether certification is appropriate.

187. Numerosity: Fed R. Civ. P. 23(a)(1). The National Class members are so numerous that joinder of all members is impracticable. Upon information and belief, there are hundreds of thousands of individuals whose PII and PHI may have been improperly disclosed to Google and Meta, and the Class is identifiable within Nourish's records.

188. Commonality: Fed. R. Civ. P. 23(a)(2) and (b)(3). Questions of law and fact common to the Class exist and predominate over any questions affecting only individual Class Members. These include:

a. Whether and to what extent Nourish had a duty to protect the Private Information of Plaintiffs and Class Members;

b. Whether Nourish had duties not to disclose the Private Information of Plaintiffs and Class Members to Google and Meta;

c. Whether Nourish adequately, promptly, and accurately informed Plaintiffs and Class Members that their Private Information would be disclosed to third parties;

d. Whether Nourish violated the law by failing to promptly notify Plaintiffs and Class Members that their Private Information had been compromised;

e. Whether Nourish adequately addressed and fixed the practices which permitted the disclosure of patient Private Information;

f. Whether Nourish engaged in unfair, unlawful, or deceptive practices by failing to safeguard the Private Information of Plaintiffs and Class Members;

g. Whether Nourish violated the consumer protection statutes asserted as claims in this Complaint;

h. Whether Plaintiffs and Class Members are entitled to actual, consequential, and/or nominal damages as a result of Nourish's wrongful conduct; and

i. Whether Plaintiffs and Class Members are entitled to injunctive relief to redress the imminent and currently ongoing harm faced as a result of Nourish's disclosure of their Private Information.

189.    Typicality: Fed. R. Civ. P. 23(a)(3). Plaintiffs' claims are typical of those of other Class Members because all had their Private Information compromised as a result of Nourish's incorporation of the Pixels due to Nourish's misfeasance.

190.    Adequacy: Fed. R. Civ. P. 23(a)(4). Plaintiffs will fairly and adequately represent and protect the interests of the Class Members in that Plaintiffs have no disabling conflicts of interest that would be antagonistic to those of the other Members of the Class. Plaintiffs seeks no relief that is antagonistic or adverse to the Members of the Class and the infringement of the rights and the damages Plaintiffs has suffered are typical of other Class Members. Plaintiffs have also retained counsel experienced in complex class action litigation, and Plaintiffs intend to prosecute this action vigorously.

191.    <u>Superiority and Manageability</u>: Fed. R. Civ. P. 23(b)(3). Class litigation is an appropriate method for fair and efficient adjudication of the claims involved. Class action treatment is superior to all other available methods for the fair and efficient adjudication of the controversy alleged herein; it will permit a large number of Class Members to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that hundreds of individual actions would require. Class action treatment will permit the adjudication of relatively modest claims by certain Class Members, who could not individually afford to litigate a complex claim against a large corporation like Nourish. Further, even for those Class Members who could afford to litigate such a claim, it would still be economically impractical and impose a burden on the courts.

192.    <u>Policies Generally Applicable to the Class</u>: Fed. R. Civ. P. 23(b)(2). This class action is also appropriate for certification because Nourish has acted or refused to act on grounds generally applicable to the Class, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the Class Members and making final injunctive relief appropriate with respect to the Class as a whole. Nourish's policies challenged herein apply to and affect Class Members uniformly and Plaintiffs' challenge of these policies hinges on Nourish's conduct with respect to the Class as a whole, not on facts or law applicable only to Plaintiff.

193.    The nature of this action and the nature of laws available to Plaintiffs and Class Members make the use of the class action device a particularly efficient and appropriate procedure to afford relief to Plaintiffs and Class Members for the wrongs alleged because Nourish would necessarily gain an unconscionable advantage since they would be able to exploit and overwhelm the limited resources of each individual Class Member with superior financial and legal resources;

the costs of individual suits could unreasonably consume the amounts that would be recovered; proof of a common course of conduct to which Plaintiffs was exposed is representative of that experienced by the Class and will establish the right of each Class Member to recover on the cause of action alleged; and individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation.

194.    The litigation of the claims is manageable. Nourish's uniform conduct, the consistent provisions of the relevant laws, and the ascertainable identities of Class Members demonstrate that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

195.    Adequate notice can be given to Class Members directly using information maintained in Nourish's records.

196.    Unless a class-wide injunction is issued, Nourish may continue disclosing the Private Information of Class Members, Nourish may continue to refuse to provide proper notification to Class Members regarding the practices complained of herein, and Nourish may continue to act unlawfully as set forth in this Complaint.

197.    Further, Nourish has acted or refused to act on grounds generally applicable to the Class and, accordingly, final injunctive or corresponding declaratory relief with regard to the Class Members as a whole is appropriate under Rule 23(b)(2) of the Federal Rules of Civil Procedure.

198.    <u>Issue Certification</u>: Fed. R. Civ. P. 23(c)(4). Likewise, particular issues are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to, the following:

a.  Whether Nourish owed a legal duty to not disclose Plaintiffs' and Class Members' Private Information;

b.  Whether Nourish breached a legal duty to Plaintiffs and Class Members to exercise due care in collecting, storing, using, and safeguarding their Private Information;

c.  Whether Nourish failed to comply with its own policies and applicable laws, regulations, and industry standards relating to data security;

d.  Whether Nourish adequately and accurately informed Plaintiffs and Class Members that their Private Information would be disclosed to third parties;

e.  Whether Nourish failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information disclosed to third parties; and

f.  Whether Class Members are entitled to actual, consequential, and/or nominal damages, and/or injunctive relief as a result of Nourish's wrongful conduct.

199.  Plaintiffs reserve the right to amend or modify the Class definition as this case progresses.

**COUNT I**
**VIOLATIONS OF THE ELECTRONIC COMMUNICATIONS PRIVACY ACT ("ECPA")**
**18 U.S.C. § 2511 *et seq.***
**UNAUTHORIZED INTERCEPTION, USE, AND DISCLOSURE**
**(On Behalf of Plaintiffs and the National Class)**

200.  Plaintiffs incorporates ¶¶ 1-178 ("Factual Allegations") as if fully set forth herein.

44

201. ECPA protects both sending and receipt of communications. 18 U.S.C. § 2520(a) provides a private right of action to any person whose wire or electronic communications are intercepted, disclosed, or intentionally used in violation of Chapter 119.

202. The transmissions of Plaintiffs' Private Information to Nourish by consumer client devices via Nourish's Website qualifies as a "communication" under the ECPA's definition in 18 U.S.C. § 2510(12).

203. The transmissions of Plaintiffs' Private Information to medical professionals qualifies as a "communication" under the ECPA's definition in 18 U.S.C. § 2510(2).

204. **Electronic Communications**. The transmission of Private Information between Plaintiffs and Class Members and Nourish via its Website with which they chose to exchange communications are "transfer[s] of signs, signals, writing,…data, [and] intelligence of [some] nature transmitted in whole or in part by a  wire, radio, electromagnetic, photoelectronic, or photooptical system that affects interstate commerce" and are therefore "electronic communications" within the meaning of 18 U.S.C. § 2510(2).

205. **Content**. The ECPA defines content, when used with respect to electronic communications, to "include[] any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(8) (emphasis added).

206. **Interception**. The ECPA defines the interception as the "acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device" and "contents … include any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(4), (8).

207. **Electronic, Mechanical, or Other Device**. The ECPA defines "electronic, mechanical, or other device" as "any device … which can be used to intercept a[n] … electronic

communication[.]" 18 U.S.C. § 2510(5). The following constitute "devices" within the meaning of 18 U.S.C. § 2510(5):

    a. Plaintiffs' and Class Members' browsers;

    b. Plaintiffs' and Class Members' computing devices;

    c. Nourish's web-servers; and

    d. The Pixel deployed by Nourish to effectuate the sending and acquisition of patient communications.

208. By utilizing and embedding the Pixels on its Website, Nourish intentionally intercepted, endeavored to intercept, and procured another person to intercept, the electronic communications of Plaintiffs and Class Members, in violation of 18 U.S.C. § 2511(1)(a).

209. Specifically, Nourish intercepted Plaintiffs' and Class Members' electronic communications via the Pixel, which tracked, stored, and unlawfully disclosed Plaintiffs' and Class Members' Private Information to Google and Meta. These communications include button clicks, provider names, state selected, among other information.

210. Nourish's intercepted communications include, but are not limited to, communications to/from Plaintiffs' and Class Members' regarding PII and PHI and scheduling.

211. By intentionally disclosing or endeavoring to disclose the electronic communications of the Plaintiffs and Class Members to affiliates and other third parties, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Nourish violated 18 U.S.C. § 2511(1)(c).

212. By intentionally using, or endeavoring to use, the contents of the electronic communications of Plaintiffs and Class Members, while knowing or having reason to know that

the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Nourish violated 18 U.S.C. § 2511(1)(d).

213. **Unauthorized Purpose**. Nourish intentionally intercepted the contents of Plaintiffs' and Class Members' electronic communications "for the purpose of committing[] criminal or tortious act[s] in violation of the Constitution or laws of the United States or of any State"—namely, invasion of privacy and disclosure of HIPAA-protected PHI without the required consent of Plaintiffs and Class Members, among others.  18 U.S.C. § 2511(2)(d).

214. Nourish intentionally used the wire or electronic communications to increase its profit margins. Nourish specifically used the Pixels to track and utilize Plaintiffs' and Class Members' Private Information for financial gain and acted to harm Plaintiffs and Class Members by ultimately disclosing their HIPAA-protected Private Information.

215. Nourish was not "acting under color of law to intercept" Plaintiffs and the Class Member's wire or electronic communication. 18 U.S.C. § 2511(2)(c).

216. Plaintiffs and Class Members did not authorize Nourish to acquire the content of their communications for purposes of invading Plaintiffs' privacy via the Pixel tracking code.

217. Any purported consent that Nourish received from Plaintiffs and Class Members was not valid.

218. In sending and in acquiring the content of Plaintiffs' and Class Members' communications relating to the browsing of Nourish's Website, Nourish's purpose was tortious and designed to violate federal and state legal provisions, including as described above the following: (1) a knowing intrusion into a private, place, conversation, or matter that would be highly offensive to a reasonable person; and (2) violation of the ECPA 18 U.S.C. § 2511 *et seq*.

**COUNT II**
**NEGLIGENCE AND NEGLIGENCE PER SE**

47

**(On behalf of Plaintiffs and the National Class)**

219.    Plaintiffs incorporates ¶¶ 1-178 ("Factual Allegations") as if fully set forth herein.

220.    Nourish encouraged and/or required Plaintiffs and Class members to submit Private Information to obtain healthcare services.

221.    Upon accepting, storing, and controlling the Private Information of Plaintiffs and Class Members in its computer systems, Nourish owed, and continue to owe, a duty to Plaintiffs and the Class to exercise reasonable care to secure, safeguard, and protect their highly sensitive Private Information from disclosure to third parties.

222.    Nourish otherwise owed Plaintiffs and Class Members a duty to exercise reasonable care in handling, securing, and safeguarding their Private Information in violation of the confidential relationship between healthcare providers and patients; the sensitive nature of the Private Information; federal and state statutes[28], including HIPAA and Section 5 of the Federal Trade Commission Act (15 U.S.C. § 45(n)); and industry standards and professional codes of conduct.

---

[28] *See, e.g.,* Alabama: Ala. Code § 34-22-83(d)(1); Arizona: Ariz. Rev. Stat. Ann. § 36-3602(B); Ariz. Rev. Stat. Ann. § 12-2292(A); see Ariz. Rev. Stat. Ann. § 12-2291; Ariz. Rev. Stat. Ann. § 12-2294; Arkansas: Ark. Code Ann. § 17-80-404 (e)(2)-(3); California: Cal. Bus. & Prof. Code § 2290.5(f); Colorado: Colo. Rev. Stat. Ann. § 12-30-124 (6); Delaware: DEL. CODE. ANN. tit. 6, §12B-100; Florida: Fla. Stat. Ann. § 456.47(3); Fla. Stat. § 456.057(10); Georgia: O.C.G.A. §§ 31-33-2, 31-33-8; Illinois: 225 Ill. Comp. Stat. Ann. 150/15(b); Indiana: Ind. Code Ann. § 25-1-9.5-7 (d); Ind. Code Ann. § 16-39-5-3; Kansas: Kan. Stat. Ann. § 65-6825(a); Kentucky: Ky. Rev. Stat. Ann. § 310.200 (1)(b); Louisiana: La. Stat. Ann. § 40:1223.4(B)(1); Maine: Me. Rev. Stat. Ann. tit. 32, § 9916 (3); Maryland: Md. Code Ann., Health-Gen. § 4-302 (a)(1); Minnesota: Minn. Stat. Ann. § 144.293; Montana: Mont. Code Ann. § 50-16-525; Nebraska: Neb. Rev. Stat. Ann. § 71-8505; Nevada: Nev. Rev. Stat. Ann. § 439.589; New Hampshire: N.H. Rev. Stat. Ann. § 332-I:2; New Jersey: N.J. Stat. Ann. § 45:1-62 (g); New Mexico: N.M. Stat. Ann. § 24-25-4; Ohio: Ohio Rev. Code Ann. § 4743.09 (3)(m); Ohio Admin. Code 5122-29-31(K); Oklahoma: Okla. Stat. Ann. tit. 59, § 478.1 (B); South Carolina: S.C. Code Ann. § 40-42-20 (A)(3); South Dakota: S.D. Codified Laws § 34-52-8 (3); Tennessee: Tenn. Code Ann. § 63-2-101(b)(1)(A); Texas: Tex. Occ. Code Ann. § 111.003; Washington: Wash. Rev. Code Ann. § 18.134.040 (1); Wisconsin: Wis. Stat. Ann. § 146.816; Wyoming: Wyo. Stat. Ann. § 33-47-109.

223. Nourish breached their duty of care by installing and implementing the Pixels on their Website, knowing that such technologies would disclose Plaintiffs' and Class Members' Private Information to Google without authorization, and knowing that Google and Meta would identify specific individuals and link their Private Information to their personal identities.

224. Nourish otherwise breached this duty by failing to exercise reasonable care in safeguarding and protecting Plaintiffs' and Class Members' Private Information from unauthorized disclosure *inter alia* by sending Plaintiffs' and Class Members' Private Information to third-parties by unsecure means, thus rendering that information easy to intercept by further, unintended third-parties.

225. It was reasonably foreseeable that Nourish's failure to exercise reasonable care in safeguarding and protecting Plaintiffs' and Class Members' Private Information through its use of the Pixels would result in Google and Meta gaining access to such Private Information for no lawful purpose.

226. Nourish's breach of their duty of care was the proximate cause of injuries and damages to Plaintiffs and Class Members.

227. As a direct and proximate result of Nourish's negligence, Plaintiffs and Class Members have suffered damages, including invasion of privacy and loss of confidentiality of their Private Information; loss of the benefit of their bargain; diminution in value of their Private Information; continuing risk to their Private Information; increased infiltrations into their privacy through spam and targeted advertising they did not ask for; and loss of privacy, confidentiality, embarrassment, emotional distress, humiliation, and enjoyment of life.

228. Plaintiffs and Class Members are entitled to compensatory damages in an amount to be determined at trial.

## COUNT III
## BREACH OF FIDUCIARY DUTY
### (On Behalf of Plaintiffs and the National Class)

229.    Plaintiffs incorporates ¶¶ 1-178 ("Factual Allegations") as if fully set forth herein.

230.    In light of the special relationship between Nourish and Plaintiffs and Class Members, whereby Nourish became a guardian of Plaintiffs' and Class Members' Private Information, Nourish became a fiduciary by their undertaking and guardianship of Private Information, to act primarily for Plaintiffs and Class Members:

   a. for the safeguarding of Plaintiffs' and Class Members' Private Information;

   b. to timely notify Plaintiffs and Class Members of an unauthorized disclosure; and

   c. to maintain complete and accurate records of what information (and where) Nourish did and do store.

231.    Nourish has a fiduciary duty to act for the benefit of Plaintiffs and Class Members upon matters within the scope of Nourish's relationship with their patients and former patients, in particular, to keep secure their Private Information.

232.    Nourish breached its fiduciary duties to Plaintiffs and Class Members by disclosing their Private Information to Google and Meta, and separately, by failing to notify Plaintiffs and Class Members of this fact.

233.    Nourish's breach of fiduciary duty was a legal cause of damage to Plaintiffs and Class Members.

234.    But for Nourish's breach of fiduciary duty, the damage to Plaintiffs and Class Members would not have occurred.

50

235.    As a direct and proximate result of Nourish's breach of their fiduciary duties, Plaintiffs and Class Members have suffered and will continue to suffer injury and are entitled to compensatory, nominal, and/or punitive damages and disgorgement of ill-gotten gains, in an amount to be proven at trial.

## COUNT IV
## BREACH OF CONFIDENCE
### (On Behalf of Plaintiffs and the National Class)

236.    Plaintiffs incorporates ¶¶ 1-178 ("Factual Allegations") as if fully set forth herein. Medical providers have a duty to their patients to keep non-public medical information completely confidential.

237.    Plaintiffs and Class Members had reasonable expectations of privacy in their communications exchanged with Nourish, including communications exchanged on Nourish's Website.

238.    Contrary to its duties as a medical provider and its express promises of confidentiality, Nourish installed its Pixels and, upon information and belief, Conversions API to disclose and transmit to third parties Plaintiffs' and Class Members' communications with Nourish, including Private Information and the contents of such information.

239.    These disclosures were made without Plaintiffs' or Class Members' knowledge, consent, or authorization, and were unprivileged.

240.    The third-party recipients included, but may not be limited to, Google and Meta. The harm arising from a breach of provider-patient confidentiality includes erosion of the essential confidential relationship between the healthcare provider and the patient.

51

241.    As a direct and proximate cause of Nourish's unauthorized disclosures of patient personally identifiable, non-public medical information, and communications, Plaintiffs and Class Members were damaged by Nourish's breach in that:

    a.  Sensitive and confidential information that Plaintiffs and Class Members intended to remain private is no longer private;

    b.  Plaintiffs and Class Members face ongoing harassment and embarrassment in the form of unwanted targeted advertisements;

    c.  Nourish eroded the essential confidential nature of the provider-patient relationship;

    d.  General damages for invasion of their rights in an amount to be determined by a jury;

    e.  Nominal damages for each independent violation;

    f.  Nourish took something of value from Plaintiffs and Class Members and derived benefit therefrom without Plaintiffs' and Class Members' knowledge or informed consent and without compensation for such data;

    g.  Plaintiffs and Class Members did not get the full value of the medical services for which they paid, which included Nourish's duty to maintain confidentiality;

    h.  Nourish's actions diminished the value of Plaintiffs' and Class Members' Private Information; and

    i.  Nourish's actions violated the property rights Plaintiffs and Class members have in their Private Information.

**COUNT V**
**BREACH OF IMPLIED CONTRACT**
**(On Behalf of Plaintiffs and the National Class)**

242.    Plaintiffs incorporates ¶¶ 1-178 ("Factual Allegations") as if fully set forth herein. As a condition of utilizing Nourish's digital platforms and receiving services from Nourish, Plaintiffs and the Class provided their Private Information and compensation for their medical care.

243.    When Plaintiffs and Class Members provided their Private Information to Nourish, they entered into an implied contract pursuant to which Nourish agreed to safeguard and not disclose their Private Information without consent.

244.    Plaintiffs and Class Members would not have entrusted Nourish with their Private Information in the absence of an implied contract between them and Nourish obligating Nourish to not disclose Private Information without consent.

245.    Nourish breached these implied contracts by disclosing Plaintiffs' and Class Members' Private Information without consent to third parties like Google and Meta.

246.    As a direct and proximate result of Nourish's breaches of these implied contracts, Plaintiffs and Class Members sustained damages as alleged herein, including but not limited to the loss of the benefit of their bargain and diminution in value of Private Information.

247.    Plaintiffs and Class Members are entitled to compensatory and consequential damages as a result of Nourish's breach of implied contract.

**COUNT VI**
**UNJUST ENRICHMENT**
**(On Behalf of Plaintiffs and the National Class)**

53

248.    Plaintiffs incorporates ¶¶ 1-178 ("Factual Allegations") as if fully set forth herein. Nourish benefits from the use of Plaintiffs' and Class Members' Private Information and unjustly retained those benefits at their expense.

249.    Plaintiffs and Class Members conferred a benefit upon Nourish in the form of Private Information that Nourish collected from Plaintiffs and Class Members, without authorization and proper compensation. Nourish consciously and voluntarily collected and used this information for its own gain, providing Nourish with economic, intangible, and other benefits, including substantial monetary compensation.

250.    Nourish unjustly retained those benefits at the expense of Plaintiffs and Class Members because Nourish's conduct damaged Plaintiffs and Class Members, all without providing any commensurate compensation to Plaintiffs and Class Members.

251.    The benefits that Nourish derived from Plaintiffs and Class Members was not offered by Plaintiffs and Class Members gratuitously and rightly belongs to Plaintiffs and Class Members. It would be inequitable under unjust enrichment principles in New York and every other state for Nourish to be permitted to retain any of the profit or other benefits wrongly derived from the unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

252.    Nourish should be compelled to disgorge into a common fund for the benefit of Plaintiffs and Class Members all unlawful or inequitable proceeds that Nourish received, and such other relief as the Court may deem just and proper.

**COUNT VII**
**INVASION OF PRIVACY**
**(On Behalf of Plaintiffs and the National Class)**

253.   Plaintiffs incorporates ¶¶ 1-178 ("Factual Allegations") as if fully set forth herein. The Private Information of Plaintiffs and Class Members consists of private and confidential facts and information that was never intended to be shared beyond private communications.

254.   Plaintiffs and Class Members had a legitimate expectation of privacy regarding their Private Information shared on Nourish's Website and were accordingly entitled to the protection of this information against disclosure to Google and Meta.

255.   Nourish owed a duty to Plaintiffs and Class Members to keep their Private Information confidential.

256.   Nourish's unauthorized disclosure of Plaintiffs' and Class Members' Private Information to Google and Meta, third-party social media and marketing giants, is highly offensive to a reasonable person.

257.   Nourish's willful and intentional disclosure of Plaintiffs' and Class Members' Private Information constitutes an intentional interference with Plaintiffs' and the Class Members' interest in solitude or seclusion, either as to their person or as to their private affairs or concerns, of a kind that would be highly offensive to a reasonable person.

258.   Nourish's conduct constitutes an intentional physical or sensory intrusion on Plaintiffs' and Class Members' privacy because Nourish facilitated Google and Meta's simultaneous eavesdropping and wiretapping of confidential communications.

259.   Nourish failed to protect Plaintiffs' and Class Members' Private Information and acted knowingly when it installed Pixels and, upon information and belief, Conversions API onto its Website because the purpose of the third-party tracking tools is to track and disseminate individual's communications with the Website for the purpose of marketing and advertising.

260. Because Nourish intentionally and willfully incorporated the Pixels and Conversions API into its Website and encouraged patients to use that Website for healthcare purposes, Nourish had notice and knew that its practices would cause injury to Plaintiffs and Class Members.

261. As a proximate result of Nourish's acts and omissions, the private and sensitive PII and PHI of Plaintiffs and the Class Members was disclosed to a third party without authorization, causing Plaintiffs and the Class to suffer damages.

262. Plaintiff, on behalf of herself and Class Members, seeks compensatory damages for Nourish's invasion of privacy, which includes the value of the privacy interest invaded by Nourish, loss of time and opportunity costs, plus prejudgment interest, and costs.

263. Nourish's wrongful conduct will continue to cause great and irreparable injury to Plaintiffs and the Class since their Private Information is still maintained by Nourish and is still in the possession of Google and Meta and the wrongful disclosure of the information cannot be undone.

264. Plaintiffs and Class Members have no adequate remedy at law for the injuries relating to Nourish's continued possession of their sensitive and confidential records. A judgment for monetary damages will not undo Nourish's disclosure of the information to Google and Meta who on information and belief, continue to possess and utilize that information.

265. Plaintiff, on behalf of herself and Class Members, further seeks injunctive relief to enjoin Nourish from further intruding into the privacy and confidentiality of Plaintiffs' and Class Members' Private Information and to adhere to its common law, contractual, statutory, and regulatory duties.

## COUNT VIII
## VIOLATION OF NEW YORK GENERAL BUSINESS LAW § 349

56

**(On behalf of the National Class)**

266. Plaintiffs incorporates ¶¶ 1-178 ("Factual Allegations") as if fully set forth herein.

267. Plaintiffs and Class Members never expected that the health information they shared to use Nourish's service would be shared with an Unauthorized Third Party.

268. Nourish committed unfair or deceptive acts and practices in violation of NY GBL § 349 with respect to Plaintiffs and Class Members by:

    a. Promising to maintain the privacy and security of Plaintiffs' and Class Members' PHI as required by law;

    b. Installing the Pixels to operate as intended and transmit Plaintiffs' and Class Members' Private Information without their consent to Google and Meta;

    c. Failing to disclose or omitting material facts to Plaintiffs' and Class Members' regarding the disclosure of their Private Information to Google and Meta;

    d. Failing to take proper action to ensure the Pixels were configured to prevent unlawful disclosure of Plaintiffs' and Class Members' Private Information;

    e. Unlawfully disclosing Plaintiffs' and Class Members' Private Information to Google and Meta.

269. Nourish's actions constitute deceptive and unfair acts or practices because Nourish knew it failed to disclose to Plaintiffs' and Class Members' that their Private Information would be disclosed to Google and Meta.

270. Specifically, Nourish was aware that Plaintiffs' and Class Members' depended and relied upon it to keep their communications confidential, and Nourish instead disclosed that information to Google and Meta. Nourish intimated to Plaintiffs and Class Members that PHI and PII would be protected.

271. "[A] privacy injury can be the basis for a § 349 claim 'where confidential, individually identifiable information . . . is collected without the individual's knowledge or consent.'" *Cooper v. Mount Sinai Health Sys., Inc.*, 742 F. Supp. 3d 369, 383-84 (S.D.N.Y. 2024) (quoting *Mount v. PulsePoint, Inc.*, 684 F. App'x 32, 35 (2d Cir. 2017), as amended (May 3, 2017)); *see also Doe v. GoodRx Holdings, Inc.*, No. 23-CV-00501-AMO, 2025 WL 2052302, at *13 (N.D. Cal. July 22, 2025) (the disclosure of "medical information without consent may constitute a deceptive act actionable under" § 349) (citing *Anonymous v. CVS Corp.*, 728 N.Y.S.2d 333, 339-40 (Sup. Ct. 2001)).

272. Plaintiffs and Class Members are entitled to the relief as provided under NY GBL § 349(h), including attorneys' fees.

## COUNT IX
## VIOLATION OF THE PENNSYLVANIA WIRETAPPING AND ELECTRONIC SURVEILLANCE CONTROL ACT ("WESCA")
### 18 Pa. Cons. Stat. § 5725
### (On Behalf of Plaintiff Jane Doe 1 and the Pennsylvania Sub-Class Members)

273. Plaintiff Jane Doe 1 incorporates ¶¶ 1-178 ("Factual Allegations") as if fully set forth herein. Plaintiffs never expected that the health information she shared to use Nourish's service would be shared with an Unauthorized Third Party.

274. The Pennsylvania Wiretapping and Electronic Surveillance Control Act prohibits Nourish from:

a. "intentionally intercept[ing], endavor[ing] to intercept, or procur'ing' any other person to intercept or endeavor to intercept any wire, electronic or oral communication;

b. intentionally disclos[ing] or endavor[ing] to disclose to any other person the contents of any wire, electronic or oral communication, or evidence derived therefrom, knowing or having reason to know that the information was obtained through the interception of a wire, electronic or oral communication; and

c. intentionally us[ing] or endeavor[ing] to use the contents of any wire, electronic or oral communication, or evidence derived therefrom, knowing or having reason to know, that the information was obtained through the interception of a wire, electronic or oral communication."

18 Pa. Cons. Stat. § 5703.

275.    Any person who intercepts, discloses, uses or procures any other person to intercept, disclose or use a wire, electronic or oral communication in violation of the Act is subject to a civil action for:

a. "Actual damages, but not less than liquidated damages computed at the rate of $100 per day for each violation or $1,000, whichever is higher;

b. Punitive damages;

c. A reasonable attorney's fee and other litigation costs reasonably incurred."

18 Pa. Cons. Stat. § 5725(a).

276.    "Intercept" is defined as any "[a]ural or other acquisition of the contents of any wire, electronic or oral communication through the use of any electronic, mechanical or other device." 18 Pa. Cons. Stat. § 5702.

277.    "Contents," when "used with respect to any wire, electronic or oral communication," is defined as "any information concerning the substance, purport, or meaning of that communication." 18 Pa. Cons. Stat. § 5702.

278.  "Person" is defined as "any individual, partnership, association, joint stock company, trust, or corporation." 18 Pa. Cons. Stat. § 5702.

279.  "Electronic communication" is defined as "[a]ny transfer of signs, signals, writing, images, sounds, data or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic or photo-optical system." 18 Pa. Cons. Stat. § 5702.

280.  A WESCA claim must plead "(1) that [the claimant] engaged in a communication; (2) that he possessed an expectation that the communication would not be intercepted; (3) that his expectation was justifiable under the circumstances; and (4) that the defendant attempted to, or successfully intercepted the communication, or encouraged another to do so." *Muraski v. Penn Highlands Healthcare, Inc.*, No. CV 3:23-135, 2026 WL 353041, at *7 (W.D. Pa. Feb. 9, 2026) (quoting *Emmett v. Delta Air Lines, Inc.*, No. 2:22-1568, 2024 WL 2816502, at *7 (W.D. Pa. June 3, 2024)).

281.  At all relevant times, Nourish aided, employed, agreed with, and conspired with Google and Meta to intercept Jane Doe 1's and Pennsylvania Sub-Class Members' internet communications while accessing Nourish's Website, including the contents thereof, including appointment time and provider name, etc. Such information not only constitutes protected health information, but it also represents the substance, import, and meaning of the communications between Jane Doe 1 and other Pennsylvania Sub-Class Members had with Nourish's Website.

282.  Jane Doe 1 and other Pennsylvania Sub-Class Members had a reasonable expectation of privacy in the electronic communications they had with Nourish's Website. Nourish had given no indication given that Jane Doe 1's and Pennsylvania Sub-Class Members' Private Information would be shared with others other than that required by law or for medical care.

283.    Nonetheless, these electronic communications were transmitted to and intercepted by Google and Meta during the communication and without knowledge, authorization, or consent of Jane Doe 1 and Pennsylvania Sub-Class Members. That is because Nourish intentionally inserted an electronic device into its website that, without the knowledge and consent of Jane Doe 1 and Pennsylvania Sub-Class Members, recorded and transmitted the substance of their confidential communications with Nourish to a third party.

284.    Nourish willingly facilitated Google's and Meta's interception and collection of Jane Doe 1's and Pennsylvania Sub-Class Members' Private Information by embedding the Pixels on its Website.

285.    Nourish used the following items as a device or apparatus to intercept wire, electronic, or oral communications made by Jane Doe 1 and other Pennsylvania Sub-Class Members:

        a.    The computer codes and programs Google and Meta used to track Jane Doe 1's and Pennsylvania Sub-Class Members' communications while they were navigating the Website;

        b.    Jane Doe 1's and Pennsylvania Sub-Class Members' browsers;

        c.    Jane Doe 1's and Pennsylvania Sub-Class Members' computing and mobile devices;

        d.    Google's and Meta's web and ad servers;

        e.    The web and ad-servers from which Google and Meta tracked and intercepted Jane Doe 1's and Pennsylvania Sub-Class Members' communications while they were using a web browser to access or navigate the Website;

f. The computer codes and programs used by Google and Meta to effectuate its tracking and interception of Jane Doe 1's and Pennsylvania Sub-Class Members' communications while they were using a browser to visit Nourish's website; and

g. The plan Google and Meta carried out to effectuate its tracking and interception of Jane Doe 1's and Pennsylvania Sub-Class Members' communications while they were using a web browser or mobile browser to visit Nourish's website.

286. Nourish failed to disclose that it was using the Pixels specifically to track and automatically and simultaneously transmit communications to third parties, i.e., Google and Meta.

287. The patient communication information that Nourish transmits while using the Pixels, such as appointment time and selected provider constitutes protected health information.

288. As demonstrated hereinabove, Nourish violates the WESCA by aiding and permitting third parties to receive its patients' online communications in real time through its Website without their consent.

289. By disclosing Jane Doe 1's and Pennsylvania Sub-Class Members' Private Information, Nourish violated Jane Doe 1's and Pennsylvania Sub-Class Members' statutorily protected privacy rights.

290. As a result of the above violations and pursuant to 18 Pa. Cons. Stat. § 5703, Jane Doe 1 and Pennsylvania Sub-Class Members are entitled to actual damages or liquidated damages of $1,000 or $100 per day for each violation, whichever is higher.

291.    Under the statute, Nourish is also liable for reasonable attorneys' fees, reasonable litigation costs, injunctive and declaratory relief, and punitive damages in an amount to be determined by a jury, but sufficient to prevent the same or similar conduct by Nourish in the future.

**COUNT X**
**VIOLATION OF THE FLORIDA SECURITY COMMUNICATIONS ACT**
**(On behalf of Plaintiff Jane Doe 2 and the Florida Sub-Class Members)**

292.    Plaintiff Jane Doe 2 incorporates ¶¶ 1-178 ("Factual Allegations") as if fully set forth herein.

293.    The Florida Secretary of Communications Act ("FSCA") is codified at Florida Statutes, § 934.01, *et seq.* The FSCA begins with legislative findings, including:

> On the basis of its own investigations and of published studies, the Legislature makes the following findings…(4) to safeguard the privacy of innocent persons, the interception of wire or oral communications when none of the parties to the communications has consented to the interceptions should be allowed only when authorized by a court of competent jurisdiction and should remain under the control and supervision of the authorizing court.

294.    Florida Statutes § 934.10 provides, in pertinent part, as follows:

> Any person whose wire, oral, or electronic communication is intercepted, disclosed, or used in violation of §§ 934.04-934.09 shall have a civil cause of action against any person or entity who intercepts, discloses, or uses, or procures any person or entity to intercept, disclose, or use, such communications and shall be entitled to recover from any such person or entity which engaged in that violation such relief as may be appropriate, including: (a) [p]reliminary or equitable declaratory relief as may be appropriate; (b) [a]ctual damages, but not less than liquidated damages computed at the rate of $100 a day for each day of the violation or $1,0000, whichever is higher; (c) [p]unitive damages; and (d) [a] reasonable attorney's fee and other litigation costs reasonably incurred.

295.    The FCSA defines "electronic communication" as "any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in party by a wire, radio, electromagnetic, photoelectronic, or photo-optical systems that affects intrastate,

interstate, or foreign commerce." Fla. Stat. § 934.02(12). It further defines "intercept" as "the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." Fla. Stat. § 934.02(3).

296.   A FSCA claim must plead that (1) an electronic communication (2) was intentionally intercepted (3) in violation of the FSCA. *Cardoso v. Whirlpool Corp.*, 2021 WL 2820822, at *2 (S.D. Fla. July 6, 2021).

297.   At all relevant times, Nourish aided, employed, agreed with, and conspired with Google and Meta to intercept Jane Doe 2's and Florida Sub-Class Members' internet communications while accessing Nourish's Website, including the contents thereof, including appointment time and provider name, etc. Such information not only constitutes protected health information, but it also represents the substance, import, and meaning of the communications between Jane Doe 2 and other Florida Sub-Class Members had with Nourish's Website.

298.   Jane Doe 2 and other Florida Sub-Class Members had a reasonable expectation of privacy in the electronic communications they had with Nourish's Website. Nourish had given no indication given that Jane Doe 2's and Florida Sub-Class Members' Private Information would be shared with others other than that required by law or for medical care. The application of Pixels is not required by law or necessary for medical care.

299.   Nonetheless, these electronic communications were transmitted to and intercepted by Google and Meta during the communication and without knowledge, authorization, or consent of Jane Doe 2 and Florida Sub-Class Members. That is because Nourish intentionally inserted an electronic device into its website that, without the knowledge and consent of Jane Doe 2 and Florida Sub-Class Members, recorded and transmitted the substance of their confidential communications with Nourish to a third party.

300.   Nourish willingly facilitated Google's and Meta's interception and collection of Jane Doe 2's and Florida Sub-Class Members' Private Information by embedding the Pixels on its Website.

301.   Nourish used the following items as a device or apparatus to intercept wire, electronic, or oral communications made by Plaintiffs and other Florida Sub-Class Members:

a. The computer codes and programs Google and Meta used to track Plaintiffs' and Florida Sub-Class Members' communications while they were navigating the Website;

b. Jane Doe 2's and Florida Sub-Class Members' browsers;

c. Jane Doe 2's and Florida Sub-Class Members' computing and mobile devices;

d. Google's and Meta's web and ad servers;

e. The web and ad-servers from which Google and Meta tracked and intercepted Jane Doe 2's and Florida Sub-Class Members' communications while they were using a web browser to access or navigate the Website;

f. The computer codes and programs used by Google and Meta to effectuate its tracking and interception of Jane Doe 2's and Florida Sub-Class Members' communications while they were using a browser to visit Nourish's website; and

g. The plan Google and Meta carried out to effectuate its tracking and interception of Jane Doe 2's and Florida Sub-Class Members'

65

communications while they were using a web browser or mobile browser to visit Nourish's website.

302.    Nourish failed to disclose that it was using the Pixels specifically to track and automatically and simultaneously transmit communications to third parties, i.e., Google and Meta.

303.    The patient communication information that Nourish transmits while using the Pixels, such as the insurance provider, appointment time, and provider name constitutes protected health information.

304.    As demonstrated hereinabove, Nourish violates the FCSA by aiding and permitting third parties to receive its patients' online communications in real time through its Website without their consent.

305.    By disclosing Jane Doe 2's and Class Members' Private Information, Nourish violated Jane Doe 2's and Florida Sub-Class Members' statutorily protected privacy rights.

306.    As a result of the above violations and pursuant to Florida Statute, § 934.10, Jane Doe 2 and Florida Sub-Class Members are entitled to actual damages or liquidated damages of $1,000 or $100 per day for each violation, whichever is higher.

307.    Under the statute, Nourish is also liable for reasonable attorneys' fees, reasonable litigation costs, injunctive and declaratory relief, and punitive damages in an amount to be determined by a jury, but sufficient to prevent the same or similar conduct by Nourish in the future.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs, on behalf of themselves and Class Members, requests judgment against Nourish and that the Court grant the following:

A.    For an Order certifying the National Class and the Sub-Classes and appointing Plaintiffs and Counsel to represent the Classes;

B.      For Plaintiffs and Class Members, including Sub-Class Members, to have the relief prayed for herein;

C.      For equitable relief enjoining Nourish from engaging in the wrongful conduct alleged in this Complaint pertaining to the misuse and/or disclosure of the Private Information of Plaintiffs and Class Members;

D.      For injunctive relief requested by Plaintiff, including, but not limited to, injunctive and other equitable relief as is necessary to protect the interests of Plaintiffs and Class Members;

E.      For an award of damages, including, but not limited to, actual, consequential, punitive, and nominal damages, as allowed by law in an amount to be determined;

F.      For an award of attorneys' fees, costs, and litigation expenses, as allowed by law;

G.      For prejudgment interest on all amounts awarded; and,

H.      Such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury of all claims in this Complaint so triable.

DATE: March 18, 2026                  Respectfully Submitted,

/s/ Russell Busch
Russell Busch
11 Park Place
3rd Floor
New York, NY 10007
Phone: 919-926-7948
rbusch@brysonpllc.com

James R. DeMay*
**BRYSON HARRIS SUCIU DEMAY PLLC**
900 West Morgan Street
Raleigh, NC 27603
Phone: (919) 600-5000
jdemay@brysonpllc.com

*Pro Hac Vice Pending*

67